

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-27-1994

# Hullett v.Towers, Perrin, Forster & Crosby, et al.

Precedential or Non-Precedential:

Docket 94-1517

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Hullett v.Towers, Perrin, Forster & Crosby, et al." (1994). *1994 Decisions.* Paper 169.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/169

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

———————

NO.  94-1517
———————

JOSEPH W. HULLETT,
                              Appellee

v.

TOWERS, PERRIN, FORSTER & CROSBY, INC.;
TOWERS, PERRIN RETIREMENT INCOME PLAN;
TOWERS, PERRIN PENSION RESTORATION PLAN;
LESLIE B. TALCOTT

            Leslie B. Talcott, Appellant
                  ———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. No. 92-cv-01184
                  ———————

Argued September 20, 1994
Before:  GREENBERG, ROTH, and ROSENN, Circuit Judges
Opinion Filed October 28, 1994
                  ———————

DOUGLAS EVAN RESS, ESQ. (Argued)
MARGARET LOUD CHARENDOFF, ESQ.
Kaufman, Coren, Ress & Weidman
1525 Locust Street – 16th Floor
Philadlephia, PA  19102
  Attorneys for Appellant

GERALD F. MCCORMICK, ESQ. (Argued)
Duane Morris & Heckscher
735 Chesterbrook Boulevard – Suite 300
Wayne, PA  19084
  Attorneys for Appellee
                  ———————

OPINION OF THE COURT

ROSENN, Circuit Judge.

This case presents an interesting question concerning the interpretation of a property settlement agreement entered into by a husband and wife in anticipation of their divorce, and the application of the Employee Retirement Income Security Act of 1974 (ERISA), 28 U.S.C. § 1001 et seq., to the agreement. On February 26, 1992, Joseph W. Hullett filed suit against his ex-wife, Leslie B. Talcott, in the United States District Court for the Eastern District of Pennsylvania seeking, inter alia, a declaration that the settlement agreement did not constitute a qualified domestic relations order (QDRO) within the meaning of ERISA, and an injunction prohibiting payment of any of Hullett's pension benefits to Talcott.[1]

Each of the parties subsequently filed cross-motions for partial summary judgment. The district court granted in part Hullett's motion for partial summary judgment and denied Talcott's motion. The court held that the settlement agreement constitutes a QDRO, and that Talcott is entitled to receive one-half of the pension benefits which Hullett has accrued as of December 31, 1983, the date of the settlement agreement, if she remains unmarried at the time Hullett actually retires or is required to begin receiving pension benefits. Talcott timely appealed to this court. We reverse.

---

[1]. The district court exercised jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). This court has jurisdiction over this appeal from a final judgment pursuant to 28 U.S.C. § 1291.

I.

Hullett and Talcott were married on August 19, 1961. In 1965, Hullett commenced employment with Towers, Perrin, Forster & Crosby, Inc. (Towers, Perrin) in its reinsurance division. He thereafter became a manager, stockholder, vice-president, senior vice-president, a member of the board of directors, and a member of the Towers, Perrin executive committee.

In 1982 or 1983, Hullett and Talcott separated. On December 31, 1983, they entered into a property settlement agreement (the Agreement), which William H. Lamb, Esq., drafted. The parties' subsequent divorce decree incorporated by reference the Agreement as part of the decree. At the time of the separation, Hullett was a fully vested member of Towers, Perrin pension plans which consisted of a Retirement Income Plan qualified under Section 401(a) of the Internal Revenue Code (Plan or Pension Plan) and a non-qualified Retirement Income Restoration Plan which had become effective as of January 1, 1976. The Agreement provided that in the event that Talcott remained unmarried at the time of Hullett's retirement, Hullett would pay to her, in the year of his retirement, fifty percent of all income received pursuant to his fully vested, accrued pension credit under the Plan.

By letter dated January 22, 1986, Hullett wrote Talcott, contending that the Agreement contained an error in that the pension was suppose to be valued as of December 31, 1983, of which value Talcott was suppose to receive fifty percent.

Talcott responded that the Agreement was correct as written. Hullett's attorney then wrote Lamb seeking to confirm Hullett's position and to do the necessary to clarify the Agreement. In response, Lamb's office disputed Hullett's claim. It emphasized that on the original drafts, 100% of all income received from the pension plan was to be payable to Talcott upon Hullett's retirement and receipt of benefits, but that the valuation date was deleted in return for Talcott receiving a full 50% of whatever pension was ultimately payable to Hullett. In December of 1986, Hullett informed Larry Margel, Chief Actuary at Towers, Perrin, that he had signed an agreement which dealt with his whole pension instead of with the pension as valued at December 31, 1983, and Margel provided Hullett with some arguments regarding the situation.

On February 5, 1990, Towers, Perrin unilaterally terminated Hullett's employment. As defined in Hullett's Pension Plan, he had an early retirement date of January 1, 1991, and a normal retirement date of January 1, 2001. Hullett could receive pension benefits as of his early retirement date based upon a reduction of benefits of 5% for each year below the normal retirement date. Towers, Perrin and Hullett subsequently entered into a Release and Agreement, whereby the parties agreed that Hullett would receive a pension equal to the one he would have earned under the Plan had he remained employed with Towers, Perrin on his early retirement date.[2]

_____

[2]. This amounted to a pension under the Pension Plan of $7,258.37 per month commencing January 1, 2001, plus a social

By letter dated August 20, 1991, the administrator for the plans, Karl W. Lohwater, determined that the Agreement was a QDRO[3] within the meaning of ERISA, and that under the terms of the Agreement, Talcott was entitled to 50% of all of Hullett's pension benefits from both plans, with payment to commence when Talcott elected to receive the pension benefits. Hullett appealed this initial determination. By letter dated January 15, 1992, the plan administrator made a final determination to recognize the Agreement as a QDRO and to pay Talcott 50% of Hullett's pension, without regard to any December 31, 1983 valuation date and without regard to when Hullett decided to commence receipt of his share of the pension monies.

On February 26, 1992, Hullett filed a complaint against Talcott in federal court seeking, inter alia, a declaration that the Agreement did not constitute a QDRO, and an injunction prohibiting payment of any of Hullett's pension benefits to Talcott. Talcott filed a motion to dismiss Hullett's complaint, contending that Hullett had improperly sought de novo review of

(..continued)
security supplement under the Plan of $554.14 per month from January 1, 2001 through May 31, 2003, plus a supplemental pension of $3,220.30 per month commencing January 1, 2001.

[3]. A QDRO is defined in 29 U.S.C. § 1056(d)(3)(B)(i). Prior to 1984, ERISA's provisions failed to clearly delineate the interest of a non-employee spouse in pension benefits of the employee spouse. Under the 1984 amendments to ERISA, if a domestic relations order provides for distribution of part or all of a participant's benefits under a qualified pension plan to an alternate payee and meets the requirements set forth in the statute, then the creation, recognition, or assignment of these benefits to the alternate payee is not considered an assignment or alienation prohibited by ERISA's spendthrift provisions.

the plan administrator's determination, which the district court denied. Talcott subsequently filed a counterclaim against Hullett and a crossclaim against Towers, Perrin, Towers Perrin Retirement Plan, and Towers Perrin Pension Restoration Plan (collectively, the "Towers, Perrin Defendants"), seeking a declaration of the rights of the parties. The Towers, Perrin defendants crossclaimed seeking similar relief. Talcott also filed a motion in limine seeking the introduction of parol evidence, which the district court denied.

The parties then filed cross-motions for partial summary judgment. The district court granted in part Hullett's motion, and denied Talcott's motion regarding the QDRO determination but granted relief on other grounds. The court held that the Agreement constituted a QDRO, and that Talcott was entitled to receive one-half of the pension benefits which Hullett had accrued as of December 31, 1983 if she remains unmarried at the time Hullett actually retires or is required to begin receiving pension benefits from Towers, Perrin. Talcott filed a motion to alter or amend the judgment and for reconsideration, which the district court denied.

## II.

This court exercises plenary review over a grant of summary judgment, and we apply the same test the district court should have utilized initially. Oritani Sav. and Loan Ass'n v. Fidelity and Deposit Co., 989 F.2d 635, 637 (3d Cir. 1993). Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-32 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. Oritani, 989 F.2d at 638.

For purposes of interpretation, a property settlement agreement is treated the same as any other contract under Pennsylvania law. See e.g., Lower v. Lower, 584 A.2d 1028, 1030 (Pa.Super. 1991). A court's purpose in examining a contract is to interpret the intent of the contracting parties, as objectively manifested by them. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980). The process of interpreting a contract requires the court to make a preliminary inquiry as to whether the contract before it is ambiguous. Stendardo v. Federal Nat'l Mortgage Ass'n, 991 F.2d 1089, 1094 (3d Cir. 1993). A contract provision is ambiguous if it is susceptible of two reasonable alternative interpretations. Mellon, 619 F.2d at 1011. Where the written terms of the contract are not ambiguous and can only be read one way, the court will interpret the contract as a matter of law. Stendardo, 991 F.2d at 1094. If the contract is determined to be ambiguous, then the interpretation of the contract is left to the factfinder, to resolve the ambiguity in light of extrinsic evidence. Id.; Mellon, 619 F.2d at 1011.

Pennsylvania courts apply the "plain meaning rule" of interpretation of contracts which assumes that the intent of the parties to an instrument is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." County of Dauphin v. Fidelity & Deposit Co., 770 F. Supp. 248, 251 (M.D.Pa.) (quotation omitted), aff'd, 937 F.2d 596 (3d Cir. 1991).  Nevertheless, a determination whether the language of an agreement is unambiguous may not be apparent without examining the context in which the agreement arose.  Steuart v. McChesney, 444 A.2d 659, 662 (Pa. 1982).  Thus, a court is not always confined to the four corners of the written document in determining whether an ambiguity exists.  Mellon, 619 F.2d at 1011.  Rather, the judge must "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."  Id.

### III.

We begin our analysis by examining the language of the Agreement, which states in relevant part:

> The retirement income plan listed in Schedule "A" is payable to Husband upon his retirement.  The parties agree that in the event Wife remains unmarried at the time of Husband's retirement that fifty percent (50%) of all income received pursuant to said pension plan shall be paid by Husband to Wife in the year of his retirement.  It is understood by both parties, that this pension benefit is payable to Husband only if he survives to his early retirement date of January 1, 1991, and Husband, or Husband's

estate, are only bound hereby if Husband does so survive.

* * *

Schedule "A"

(1) Seventy (70) shares of Towers, Perrin Common Stock with a total current value of $63,700.00 on the date of valuation, December 31, 1983.

(2) Two thousand three hundred and ten (2,310) shares of Towers, Perrin Preferred Stock with a total current value of $231,000.00 on the date of valuation, December 31, 1983.

(3) Fully vested, accrued pension credit under the Towers, Perrin Retirement Income Plan (hereinafter referred to as Towers, Perrin RIP).

The district court found that the above contractual language was susceptible to only one interpretation. The court held that Talcott was entitled to 50% of the pension credit vested and accrued as of December 31, 1983, the date of the Agreement. In so holding, the court relied on the past tense form of the words "vested" and "accrued". However, this language also can be interpreted to refer to the pension credit "vested and accrued" at the time of Hullett's retirement.

The record in this case shows that the district court erred in holding that the language of the Agreement was not ambiguous. The evidence supports as reasonable Talcott's alternative interpretation that she was to receive 50% of "all" of Hullett's pension, without being limited to only 50% of the pension credit vested and accrued at the time of the Agreement.

Schedule A was specific in providing valuation dates for the other two assets identified on it, Talcott's share of the common and preferred stock, and the body of the Agreement specifically states that these assets are valued as of December 31, 1983. In contrast, the parties did not provide a valuation date for the Pension Plan. Lamb, the scrivener of the Agreement, testified that the draft version of the Agreement provided that Talcott was to receive 100% of the pension valued as of December 31, 1983, but that the valuation date was deleted in subsequent drafts and the final Agreement in return for Talcott receiving a full 50% of whatever pension was ultimately payable to Hullett.

Moreover, unlike the pension language, Talcott's entitlement to the other assets on Schedule A is in no way contingent upon her remaining unmarried. Talcott argues that this is because she was only getting the shares of stock that were rightfully hers as of the time of the divorce, but that Hullett did not want to continue increasing her share of his pension if she then chose to remarry. This interpretation of the contractual language is a reasonable one.

The district court observed that its interpretation was further supported by Paragraph 12 of the Agreement, which states that neither party has any claim to any personal property, tangible or intangible, thereafter acquired by the other. The inclusion of Paragraph 12, a standard contractual provision, does not preclude Talcott's interpretation of the Agreement as a reasonable one. As testified by the scrivener, Lamb:

> [Paragraph 12 is] a standard clause which is
> intended to cover the situation where after
> this agreement is signed husband goes out and
> buys a car or wife goes out and buys an
> airplane or a townhouse or whatever, neither
> party has any claim on any of those assets
> after this agreement is signed.

Similarly, the two contractual provisions cited by Hullett, concerning the freedom to live apart and engage in any employment and the release of claims against each other, are standard contractual provisions which serve separate and distinct purposes. These provisions are not inherently inconsistent with Talcott's suggested interpretation of the Agreement.

The extrinsic evidence presented by Talcott shows that her interpretation is a reasonable alternative one, and thus the language regarding the amount of pension benefits to which Talcott is entitled is ambiguous. See e.g., Lower, 584 A.2d at 1032 (holding that failure to define "alimony" and "support" created ambiguity to be resolved by factfinder); Lohmann v. Piczon, 487 A.2d 1386, 1389 (Pa.Super. 1985) (finding "net income after taxes," 25% of which husband was to pay wife, was ambiguous as to whether it included any of husband's tax deductions); De Witt v. Kaiser, 484 A.2d 121, 126 (Pa.Super. 1984) (finding term "income" in context of husband's support obligations to be ambiguous, thus requiring extrinsic evidence to define term). Therefore, we must remand this case to allow a factfinder to resolve the ambiguity in light of the extrinsic evidence.

IV.

The second dispute focuses on the following contractual language:

> The retirement income plan listed in Schedule "A" is payable to Husband upon his retirement. The parties agree that in the event Wife remains unmarried at the time of Husband's retirement that fifty percent (50%) of all income received pursuant to said pension plan shall be paid by Husband to Wife in the year of his retirement. It is understood by both parties, that this pension benefit is payable to Husband only if he survives to his early retirement date of January 1, 1991, and Husband, or Husband's estate, are only bound hereby if Husband does so survive.

The district court attempted to examine the use of the word "retirement" as used in the Plan to determine what the parties meant, but found that the Plan does not provide a single definition of the word. Rather, the Plan describes three separate retirement dates, early, normal, and postponed. The court thus turned back to the Agreement to determine which definition the parties intended to control. The court concluded that the parties intended that Talcott be entitled to her benefits when Hullett elects to and does receive his pension benefits, or when he is required to commence receipt of his pension benefits under the terms of the Plan, in the event that Talcott remains unmarried at that time.

Before the district court, Hullett argued that Talcott is entitled to 50% of the pension benefits which he accrued prior to December 31, 1983, only if she remains unmarried at the time he actually retires from the workplace in general. On appeal,

Hullett now adopts the district court's interpretation of the Agreement.

Talcott argues that the district court misconstrued the Agreement, and notes that the use of the term "retirement" in the Agreement directly follows a sentence in which the parties defined retirement as that point at which the retirement income plan was "payable" to Hullett. She contends that "payable" means the point at which the money may be paid on demand, not the point at which payment actually commences. See Black's Law Dictionary (5th ed. 1979) at 1016 (defining payable as "[c]apable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable"). Talcott asserts that this date would be January 1, 1991, when Hullett reached his early retirement date under the Plan, and that the court erred in construing the Agreement to empower Hullett to hold her pension money hostage to her remaining unmarried until he turns 60, in the year 2001. Talcott describes various scenarios where the district court's interpretation of the Agreement could cause her to lose all or part of her share in the pension benefits. Thus, Talcott argues, because she remained unmarried at the time of Hullett's retirement from Towers, Perrin, she is presently entitled to her 50% share of pension benefits, whatever they might be, and she is free to remarry.

Again, Talcott's interpretation of the contractual language is a reasonable alternative one. It is clear that the parties did not foresee or provide for Hullett terminating his employment with Towers, Perrin prior to when he was entitled to

his pension benefits.  Thus, the contractual language is ambiguous, and its interpretation should be left to the factfinder to resolve in light of any extrinsic evidence the parties may present on remand.

V.

The parties' final dispute concerns the district court's appropriate standard of review of the plan administrator's determinations.  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the United States Supreme Court held that challenges under section 1132(a)(1)(B) of ERISA are to be reviewed under a de novo standard unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Id. at 115. Where a plan administrator is given discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the appropriate standard of review of the administrator's determinations is an arbitrary and capricious standard.  Id. at 114-15.  Discretionary powers need not be expressly granted; they may be implied by the plan's terms.  Luby v. Teamsters Health Welfare & Pension Trust Funds, 944 F.2d 1176, 1181 (3d Cir. 1991).

Neither party has appealed the district court's ruling that the Agreement constitutes a QDRO, and therefore it is not necessary for this court to determine whether the district court erred in reviewing de novo the plan administrator's finding that the Agreement is a QDRO.  The district court did not err in holding that it should review de novo the plan administrator's

construction of the Agreement, which involved issues of contract interpretation under the Agreement and not the Plan. However, as discussed above, the Agreement is ambiguous and thus the issues of the amount of Talcott's share of pension benefits, the time of Hullett's retirement, and the effect of Talcott's marital status are for the factfinder to resolve on remand in light of the extrinsic evidence.

Additionally, the district court erred in refusing to give deference to the plan administrator's determination that he would segregate Talcott's QDRO monies and commence payment at the time she elects to receive her share. That is, when Talcott elects to begin her benefit payments, the administrator will calculate the amount she is entitled to receive by making an actuarial calculation converting the present value of one half of Hullett's pension, valued as of the date determined by the factfinder, to a pension payable over Talcott's lifetime. In contrast, the court held that Talcott may continue receiving monthly benefits only as long as Hullett receives them pursuant to the Plan.

In making his determination regarding the distribution of payments, the plan administrator exercised his discretionary authority to construe the terms of the Plan. Section 8.1(h) of the Plan provides, "If the [plan administer] receives a QDRO with respect to a Member's divorce from his Spouse, it will comply with such Order and reduce the benefits otherwise payable to or on behalf of such Member under this Plan or the Actuarial Equivalent of any benefits payable to his Spouse under this Plan

pursuant to such QDRO."  Additionally, the Plan Procedures for Domestic Relations Orders provides that any amount that would be payable to an alternate payee under a QDRO will be separately accounted for under the Plan and will remain segregated while the plan participant or alternate payee appeals the administrator's QDRO determination.  At the end of this appeal period, "the segregated amounts, adjusted for investment results, will be paid to the plan participant or the alternate payee (or credited to the account of the plan participant or alternate payee) in accordance with the determination of the [plan administrator]." Thus, the district court erred in refusing to give deference to the administrator's holding that Talcott's pension is payable over her lifetime, and instead holding that payments to Talcott will terminate when Hullett's pension payments terminate.  The court was required to uphold the administrator's determination as to QDRO payments unless it was arbitrary and capricious.  It was not.

In summary, the district court erred by granting in part Hullett's motion for partial summary judgment.  Talcott has presented reasonable alternative interpretations of the contractual language regarding the distribution of Hullett's pension and the provision requiring payment upon Hullett's retirement if Talcott remains unmarried.  Thus, these provisions are ambiguous and are appropriate for a factfinder's resolution upon remand.  Finally, although the district court properly reviewed the plan administrator's interpretation of the Agreement on a de novo basis, it erred in refusing to give deference to the

plan administrator's determination regarding the payment of benefits under the QDRO.

                                    VI.

        Accordingly, the district court's grant of partial summary judgment in favor of Hullett will be reversed and the case remanded for proceedings consistent with this opinion.