

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-10-1999

# Sanford Inv. Co. Inc. v. Ahlstrom Machinery

Precedential or Non-Precedential:

Docket 98-2036

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Sanford Inv. Co. Inc. v. Ahlstrom Machinery" (1999). *1999 Decisions.* Paper 321.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/321

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 10, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-2036

SANFORD INVESTMENT COMPANY, INC.,

        Appellant

v.

AHLSTROM MACHINERY HOLDINGS, INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-07978)
District Judge: Honorable Edmund V. Ludwig

Argued November 5, 1999

BEFORE: BECKER, Chief Judge, and GREENBERG
and CUDAHY,* Circuit Judges

(Filed: December 10, 1999)

        Peter F. Marvin (argued)
        Justin K. Miller
        Toll, Ebby, Langer & Marvin
        Two Logan Square
        18th Floor
        Philadelphia, Pa. 19103

         Attorneys for Appellant

_____
* Honorable Richard D. Cudahy, Senior Judge of the United States Court
of Appeals for the Seventh Circuit, sitting by designation.

        Jeffrey G. Weil (argued)
        Michael S. Doluisio
        Dechert, Price & Rhoads
        1717 Arch Street
        4000 Bell Atlantic Tower
        Philadelphia, Pa. 19103

         Attorney for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter is before this court on an appeal from an order for summary judgment in this diversity of citizenship commercial litigation dispute. The litigation stems from a series of business relationships formed to finance, construct and operate a waste paper recycling facility in Sanford, West Virginia (the "Project"). The owner/developer of the project was American Power Recyclers, L.P., later known as American Fiber Resources, Limited Partnership (the "Partnership"). The Partnership included two general partners and two limited partners. The general partners were American Power Corporation ("APC"), the predecessor-in-interest to the plaintiff, Sanford Investment Company, Inc., and Adirondack G.P. Inc. ("AGP"). AGP is related to Ahlstrom Kamyr, Inc., the predecessor-in-interest to defendant Ahlstrom Machinery Holdings, Inc. We refer to the Ahlstrom entitites simply as "Ahlstrom" although the contracting party was Ahlstrom Kamyr, Inc. and the party to the litigation is Ahlstrom Machinery Holdings, Inc. The limited partners were Adirondack Recycle, L.P. ("ARLP"), a company related to Ahlstrom, and American Power Investors ("API"), a company related to APC. We will refer to the appellant Sanford and its predecessor-in-interest APC as "American" but it should not be confused with American Fiber Resources, i.e., the Partnership.

On November 2, 1993, the Partnership entered into a contract with Ahlstrom referred to as the "EPC/Initial

2

Operation and Performance Testing Agreement" ("EPC contract"). The EPC contract provided that Ahlstrom would develop, construct and initially operate the Project. In return, the Partnership agreed to pay Ahlstrom an amount designated as the "Base Fee" during the initial operation of the Project. A different paragraph of the EPC contract provided that the Partnership would pay Ahlstrom a "Bonus Fee" under certain conditions. The Base Fee and the Bonus Fee were distinct payments under the EPC contract calculated in different ways. Moreover, the Bonus Fee, unlike the Base Fee, was conditional. The EPC contract provided the circumstances in which Ahlstrom was to receive the Base Fee, which is at issue in this lawsuit.

After the execution of the EPC contract, Ahlstrom and American negotiated a division of the Base Fee that they memorialized in a Letter Agreement dated December 29, 1993 (the "1993 Letter Agreement"). The 1993 Letter Agreement provides that

> 25% of the base fee payable to [Ahlstrom] under Phase II of the EPC/Initial Operation and Performance Testing Agreement shall be payable by [Ahlstrom] to [American].

American predicates this action on Ahlstrom's purported obligation to remit this 25% payment as set forth in the 1993 Letter Agreement. American contends that Ahlstrom breached the contract as of January 31, 1996, by failing to remit payments of that portion of the Base Fee due under the 1993 Letter Agreement.

The background surrounding this breach of contract case was complicated by three agreements entered into following the execution of the foregoing basic agreements. In 1995, the Partnership sought additional funding from the County Commission of Marion County, West Virginia ("Marion County"). Marion County contemplated obtaining the additional funding through the issuance of tax-free industrial development bonds.

A problem with the funding arose, however, because American was in default of its obligation under a Cash Shortfall Funding Agreement (the "CSF Agreement") dated February 13, 1995. Apparently, Marion County would not

3

approve the additional funding unless American satisfied its obligations under the CSF Agreement.

To cure its default under the CSF Agreement and clear the way for the additional funding, American sought a loan from one of its affiliates, the Conduit and Foundation Corporation ("Conduit" or "C&F "). It was contemplated that the loan would be funded by monies due and owing to Conduit from Kamtech, Inc. ("Kamtech"), an affiliate of Ahlstrom that Ahlstrom hired to construct the Project.

The plan called for Conduit to loan American the funds owed to it by Kamtech so that American could meet its obligation under the CSF Agreement and thus permit the Partnership to receive additional funds from Marion County. In order for Conduit to loan the funds due from Kamtech to American the approval of Conduit's surety, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, was required.

The arrangements among the parties arising from these circumstances were evidenced in three documents executed in December 1995. The parties refer to the first document as the "Bonus Fee Agreement" and the second document which accompanied the first as the "Bonus Fee Assignment." The final agreement was the "Surety Loan Agreement." The Bonus Fee Agreement and Bonus Fee Assignment were executed on December 20, 1995, and the Surety Loan Agreement was executed on December 26, 1995. The parties to this litigation dispute the legal effect of these agreements, in particular language found in the Surety Loan Agreement. Because the terms of the three contracts are central to the outcome of the appeal, we set forth their relevant provisions in some detail.

Each member of the Partnership signed the Bonus Fee Agreement: (1) AGP (Ahlstrom's affiliate); (2) American; (3) ARLP (Ahlstrom's affiliate); and (4) API (American's affiliate). Among other things, the Bonus Fee Agreement provided for an "assignment" of 24% of the Bonus Fee due to Ahlstrom under the EPC contract to American or its affiliate. Paragraph 4 states in pertinent part:

> Assignment of 24% of the Bonus Fee to APC. AGP shall cause its Affiliate, [Ahlstrom], to deliver to [American]

4

or its designee upon the closing of the Bond Offering an Assignment . . . through which [Ahlstrom] assigns, sells and transfers to [American] or its designee, the right to receive twenty-four percent (24%) of [Ahlstrom's] Bonus Fee under paragraph 13.3 of the EPC Contract, as amended (the `Bonus Fee'), when earned. . . . AGP acknowledges that APC has designated The Conduit and Foundation Corporation (`C&F ') [an affiliate of American] as its designee under this paragraph 4.

. . . .

[O]nce the amount of the Bonus Fee has been finally determined in accordance with the EPC Contract, [American] shall have the right thereafter to assert a claim for its 24% of such Bonus Fee directly against [the Partnership and original signatory to the EPC Contract] and the payment of such amount to C&F or National Union (as defined below) shall not be subject to offset against the obligations of [American]. Nothing in this Agreement is intended to, nor shall, give [American] or its designee or any of their Affiliates any additional rights or obligations under the EPC Contract, including, but not limited to, any rights as a third party beneficiary to the EPC Contract, except as they may currently possess as a General or Limited Partner and except for the right to enforce payment of the 24% of the Bonus Fee assigned to [American] as hereinabove provided.

App. at 112-13 (second emphasis added). With respect to National Union's rights under the Bonus Fee Agreement, section 8(k) provides:

Limitation on Rights of Others. No person or entity other that the parties hereto shall have any legal or equitable right or interest, remedy or claim under or in respect of this Agreement; provided, however, that it is acknowledged that C&F and its surety, National Union . . . are creditor and/or donee third party beneficiaries in respect of the rights of [American] to receive the 24% of the Bonus Fee assigned to it pursuant to paragraph 4 hereof and to enforce the payment of said amount against [the Partnership] as hereinabove provided.

5

App. at 115.

The second agreement, the Bonus Fee Assignment, was executed by Ahlstrom as assignor and Conduit as assignee and designee of American in the form that accompanied the Bonus Fee Agreement. The Bonus Fee Assignment effectuates the assignment of Ahlstrom's interest in 24% of the Bonus Fee provided under the EPC contract to Conduit as American's designee. The Assignment provides in relevant part:

> 1. Assignor [Ahlstrom] hereby assigns, sells and transfers to Assignee [Conduit], and Assignee hereby accepts the assignment of, the right to receive . . . twenty-four percent (24%) of Assignor's Bonus Fee under . . . the EPC Contract, . . . when earned.

App. at 120. The provisions in the Bonus Fee Assignment that follow the foregoing quoted language reiterate again American's right (as Conduit's affiliate) to assert a claim against the Partnership to collect its portion of the Bonus Fee provided in the EPC Contract assigned to it under this assignment. The next paragraph then provides the following:

> 4. Assignee [Conduit] hereby irrevocably dir ects that any amounts otherwise payable to it with respect to the 24% of the Bonus Fee assigned to it hereby shall be paid directly to [National Union], and Assignor [Ahlstrom] hereby agrees to so pay any such amounts that it shall receive from AFR. . . . It is acknowledged that [National Union] is a creditor and/or donee third party beneficiary in respect of the right to receive and enforce payment of the 24% Bonus Fee assigned to Assignee as provided herein.

App. at 115 (emphasis added). Thus, under the Bonus Fee Agreement and Assignment, Ahlstrom assigned its right to receive 24% of the Bonus Fee to Conduit, which was the designee of American (as set forth in the Bonus Fee Agreement). By the assignment, Conduit, as assignee, received the right to enforce payment of 24% of the Bonus Fee from the Partnership, and National Union was deemed the third-party beneficiary of the assignment. Moreover,

6

Ahlstrom was to pay Conduit's portion of the Bonus Fee by sending it directly to National Union.

As we have indicated, the third and final agreement evidencing the parties' arrangement is the Surety Loan Agreement, which the following parties executed: (1) American; (2) API (American's affiliate); (3) Conduit (American's affiliate); (4) Richard Halloran (Conduit's indemnitor under prior March 1995 Surety Agreement); and (5) National Union (the Surety). In the Surety Loan Agreement, National Union agreed to defer receipt of funds Conduit owed to it, and permitted the funds to be used by American to satisfy its obligations under the CSF. In return, American and its affiliates agreed to the following provision:

> 4. In further consideration of the Surety's consen t to the deferral by Conduit of the receipt of the Loaned Funds [i.e., the monies due from Kamtech],[American and its affiliates]:
>
>  A. hereby transfer, assign, convey, gr ant a security interest in, pledge and mortgage to [National Union] all income, dividends, distributions, loan repayments, proceeds . . . related in any way to the Project, or any other payments of any kind payable to [American or its affiliates] or any of their designees from[the Partnership], [Ahlstrom], AGP, ARLP, Kamtech or any of their designees . . . (including but not limited to the Bonus Fees . . .) coupled with the rights to enforce the payments of same . . . as further collateral security and as a source for the repayment of all indebtedness of [the signatories] under the Contractor/Surety Agreement and this Surety Loan Agreement.

App. at 85 (emphasis added). Unlike the Bonus Fee Agreement and Bonus Fee Assignment, Ahlstrom was not a signatory to the Surety Loan Agreement. To implement the Surety Loan Agreement, American sent Ahlstrom a letter dated March 27, 1996, directing that all payments related to the recycling facility be paid directly to National Union.

II. PROCEDURAL HISTORY

Notwithstanding its assignment to National Union, American filed this action in December 1997, to recover

7

from Ahlstrom $324,470, together with interest, an amount allegedly representing that portion of the Base Fee, i.e., 25% owed to it under the 1993 Letter Agreement. According to the complaint, American had received payments under the 1993 Letter Agreement through January 31, 1996, but not thereafter. Ahlstrom filed a motion for summary judgment on July 8, 1998, contending that American did not have standing to sue Ahlstrom for its percentage of the Base Fee due under the 1993 Letter Agreement because it had assigned its right to enforce that agreement to National Union in the Surety Loan Agreement.

The district court heard oral argument on the matter on October 8, 1998, and on October 16, 1998, entered an order granting Ahlstrom's motion. Then on October 29, 1998, the court entered a memorandum in support of its order.

The district court determined that American lacked standing to sue Ahlstrom for the Base Fee payments under the 1993 Letter Agreement because of its complete assignment of that right to National Union pursuant to the Surety Loan Agreement. Under Pennsylvania law, which the parties treat as applicable, a contracting party that has assigned its contract rights to a third party does not have standing to enforce that contract. See West Penn Admin., Inc. v. Pittsburgh Nat'l Bank, 433 A.2d 896, 902 (Pa. Super. Ct. 1981). While the district court accepted American's argument that the Surety Loan Agreement should be read together with the Bonus Fee Agreement and Bonus Fee Assignment because the three agreements were part of a larger transaction, the court nonetheless determined that nothing in the prior agreements rendered ambiguous the unequivocal language of the assignment in the Surety Loan Agreement.

American appeals from the district court's order granting Ahlstrom's motion. We have jurisdiction under 28 U.S.C. S 1291 and exercise plenary review. See Nelson v. Upsala College, 51 F.3d 383, 385 (3d Cir. 1995); Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1423 (3d Cir. 1994).

8

III. DISCUSSION

American contends that the district court's interpretation of the Bonus Fee Agreement, Bonus Fee Assignment, and Surety Loan Agreement was erroneous. It maintains that it has offered an interpretation of the Surety Loan Agreement which is reasonable given the language used and the circumstances surrounding the series of transactions. Accordingly, it contends that summary judgment was inappropriate because the relevant provision in the Surety Loan Agreement was ambiguous. American further contends that the district court erred in not construing the three contracts together, by not considering the commercial context in which the agreements were executed, and by not addressing Ahlstrom's subsequent performance under the 1993 Letter Agreement even though its conduct was consistent with American's construction of the agreements. This reference to subsequent performance related to Ahlstrom's payment in January 1996, after the execution of the Surety Loan Agreement, of a portion of the Base Fee directly to American. Finally, citing Fed. R. Civ. P. 17, American contends that the district court failed to weigh the fact that American was the real party in interest to the Surety Loan Agreement.

"To affirm a grant of summary judgment on an issue of contract interpretation, we must conclude that the contractual language is subject to only one reasonable interpretation." Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999). Thus, the overarching question on appeal is whether American has provided a reasonable alternative reading of the assignment clause in the Surety Loan Agreement under which Ahlstrom would not be entitled to judgment as a matter of law.

A court's purpose in examining a contract is to interpret the intent of the contracting parties, as they objectively manifest it. See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995); Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980). The process of interpreting a contract proceeds in two steps. First, the court must make a preliminary inquiry as to whether the contract before it is ambiguous. See Duquesne, 66 F.3d at 613; Allegheny, 40 F.3d at 1424. This

9

question is an issue of law for the court to resolve. A term is ambiguous if it is susceptible to reasonable alternative interpretations. See Duquesne, 66 F.3d at 614; Mellon Bank, 619 F.2d at 1011 (defining ambiguity as an "[i]ntellectual uncertainty [or] the condition of admitting two or more meanings, of being understood in more than one way, or referring to two or more things at the same time . . . ."). If the court determines that a given term in a contract is ambiguous, then the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations. See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994).

"In determining whether a contract is ambiguous, the court assumes the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999) (citing and quoting Hullett, 38 F.3d at 111) (quotation marks omitted); Allegheny, 40 F.3d at 1424. Nevertheless, in that undertaking a court is not always confined to the four corners of a document. Rather, it may not be apparent whether a contract is ambiguous without an examination of the context in which the contract was made. See Hullett, 38 F.3d at 111; see also Pacitti, 193 F.3d at 773 (noting that in determining if a contract is ambiguous, court is not confined to its four corners and may read the contract in the context in which it was made). Therefore, to determine the parties' intentions, the court may consider, among other things, "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Hullett, 38 F.3d at 111 (quoting Mellon Bank , 619 F.2d at 1011).

Under Pennsylvania law, "when two or more writings are executed at the same time and involve the same transaction, they should be construed as a whole." Western United Assurance Co. v. Hayden, 64 F.3d 833, 842 (3d Cir. 1995) (citations omitted). If the court finds that the

10

contracts pertain to the same transaction, the fact that the signatories are different does not mean that this rule does not apply. See id. This rule applies equally where several agreements are made as part of one transaction even though they are executed at different times. See id.

In this case, the district court concluded that the Surety Loan Agreement was unambiguous and capable of only one reasonable interpretation -- i.e., American assigned National Union the right to enforce the Base Fee arrangement set forth in the 1993 Letter Agreement. Thus, because the Surety Loan Agreement effectuated a complete assignment to National Union, American, as the assignor of the right to receipt of the Base Fee, did not retain the right to sue Ahlstrom for its portion of the Base Fee as provided under the 1993 Letter Agreement.

American contends, however, that there is a reasonable alternative interpretation of the assignment of rights embodied in the Surety Loan Agreement when it is considered together with the Bonus Fee Agreement and Bonus Fee Assignment as a unified transaction. Its interpretation begins with the language of the Surety Loan Agreement, recognizing that by its terms, American and its affiliates assigned to the Surety "all income .. . related in any way to the Project . . . (including but not limited to the Bonus Fees . . .) coupled with the rights to enforce the payments of same. . . ." American states that while this language makes it clear that American and Conduit assigned to National Union certain rights with respect to the Base Fee and the Bonus Fee, "the nature and extent of the rights assigned are less than clear." It then turns to the language in the Bonus Fee Agreement and Bonus Fee Assignment which designates National Union as a "third-party beneficiary" of Conduit's right to receive the Bonus Fee from Ahlstrom as effectuated by the assignment. Pointing to that language, it claims that "[c]onstruing these documents together . . . the Surety's right to receive `all income' from the Project and to `enforce payments' of the income [quoting from the Surety Loan Agreement], are the rights of a third-party beneficiary, not a promisee."

Thus, by a "parity of reasoning," it concludes that if the surety was assigned a third-party beneficiary interest in the

11

Bonus Fee, National Union also was assigned a third-party beneficiary interest with respect to Ahlstrom's payment of the Base Fee and any other income from the Project. Of course, interpreting the assignment in the Surety Loan Agreement in this manner would inure to American's benefit, as "both a promisee and an intended third party beneficiary may sue to enforce a contract." See In re Kaplan, 143 F.3d 807, 813 (3d Cir. 1998) (applying Illinois law); see also Restatement (Second) of Contracts S 305 (1981) (describing promisor's overlapping duties to beneficiary and promisee).

Applying the standards of contract interpretation discussed above, we reject American's alternate interpretation which would compel the conclusion that the relevant provision in the Surety Loan Agreement is ambiguous. The plain language of the assignment found in paragraph four of the Surety Loan Agreement, states that American and its affiliates hereby "transfer, assign, convey . . . to [National Union] all income . . . related in any way to the Project, or any other payments of any kind payable to [American and its affiliates] . . . (including but not limited to the Bonus Fees) . . . coupled with the rights to enforce the payments of the same." This language inescapably and unambiguously expresses an intent to assign to National Union all of the assignors' rights to income or payments of any kind, along with the rights to enforce the same. See Western United, 64 F.3d at 838. There is no language in this paragraph limiting in any way National Union's interest in the assigned property; nor is there any language which indicates that the assignment should be construed as partial rather than complete. See Gordon v. Hartford Sterling Co., 179 A. 234, 236 (Pa. 1935) ("Where part of a chose in action has been assigned, the assignor and the assignee may unite in a suit for the enforcement of the chose; the assignor may sue alone, but the assignee may not sue on it in his own name."); see also 6A Charles Allan Wright et al., Federal Practice and Procedure S 1545, at 351-53 (2d ed. 1990).

While, as we have indicated, the plain language of the assignment informs our result, we also observe that an examination of the Bonus Fee Agreement, Bonus Fee

12

Assignment, and Surety Loan Agreement demonstrates that the three agreements are complementary rather than contradictory and are consistent with the plain language of the Surety Loan Agreement. Clearly, the Bonus Fee Agreement, Bonus Fee Assignment, and Surety Loan Agreement each represent distinct aspects of the overall transaction among the parties and accomplish different results. Because each document sets forth different aspects of the overall transaction, the provisions of each must be understood in that context and applied so as to recognize their distinct purpose. See Shehadi v. Northeastern Nat'l Bank, 378 A.2d 304, 306 (Pa. 1977); Flatley v. Penman, 632 A.2d 1342, 1344 (Pa. Super. Ct. 1993). Thus, we consider the documents together.

The first document is the Bonus Fee Agreement, entered into by the four members of the Partnership, AGP, ARLP, API and American. The only relevant aspect of the Bonus Fee Agreement for purposes of this analysis is its provision which states that AGP (Ahlstrom's affiliate) agrees to cause Ahlstrom to effectuate an assignment of its right to 24% of the Bonus Fee to American's designee Conduit. The second document, the Bonus Fee Assignment, in turn, is an assignment between Ahlstrom (as assignor) and Conduit (as assignee and the designee of American). Its purpose was to assign or transfer Ahlstrom's right to 24% of the Bonus Fee under the EPC contract to Conduit. National Union was not a signatory to either the Bonus Fee Agreement or the Bonus Fee Assignment.

The third document, the Surety Loan Agreement, effectuated an assignment from American and its affiliates (as assignors) to National Union (as assignee). We repeat that the document assigned to National Union "all income . . . related in any way to the Project . . . or any other payments of any kind payable to [American and its affiliates] . . . from [Ahlstrom and its affiliates] (including but not limited to the Bonus Fees) . . . coupled with the rights to enforce the payments of same. . . ." Ahlstrom was not a signatory to the Surety Loan Agreement. The Surety Loan Agreement, with its broad-based assignment of all of American's and its affiliates' rights to any income or payments received from the Project, by its very terms had

13

to occur subsequently to Ahlstrom's assignment to Conduit. After all, prior to the execution of the Bonus Fee Agreement and Bonus Fee Assignment, Conduit had no right or interest in the Bonus Fee to assign to National Union. Moreover, the assignment in the Surety Loan Agreement was central to completion of the overall transaction, as it was bargained for in exchange for National Union's agreement to permit Conduit to loan the funds to American so that American could meet its obligations under the CSF Agreement.

As the foregoing analysis demonstrates, there is nothing in the Bonus Fee Agreement or Bonus fee Assignment which is inconsistent with the assignment in the Surety Loan Agreement. The only assignment in the Bonus Fee Assignment was from Ahlstrom (assignor) to Conduit (assignee) of Ahlstrom's right to receive 24% of Ahlstrom's Bonus Fee as set forth in the EPC contract. ("Assignor hereby assigns . . . to Assignee . . . the right to receive . . . twenty-four percent (24%) of Assignor's Bonus Fee under paragraph 13.3 of the EPC Contract."). Thus, the Bonus Fee Assignment did not effectuate an "assignment" from Conduit to National Union of Conduit's right to a portion of the Bonus Fee. To be sure, the agreement directed that any amounts otherwise payable to Conduit with respect to 24% of the Bonus Fee assigned to it by Ahlstrom should be paid directly to National Union as Surety. However, that arrangement is not the legal equivalent of an express assignment of rights. See 3 E. Allan Farnsworth, Farnsworth on Contracts S 11.3, at 69 (2d ed. 1998) (discussing transactions which would not qualify as assignments, and providing the following example: "Sometimes an obligee (B) orders the obligor (A) to pay a debt to a third person (C), rather than the obligee. If the order is given directly to the obligor (A), courts have little difficulty in concluding that the obligee did not intend to make an assignment. . . .").

Moreover, the designation in the Bonus Fee Agreement and Bonus Fee Assignment of National Union as the third-party beneficiary is entirely consistent with American's and its affiliates' subsequent complete assignment to National Union of the rights to any income or payments related to

14

the Project. National Union's designation as a third-party beneficiary in the Bonus Fee Assignment and subsequent status as an assignee which received not only an unencumbered right to the Bonus Fee but also the right to "any income" or "any other payments of any kind" owed to American and its affiliates, does not render the third-party beneficiary provision in the Bonus Fee Assignment inconsistent with the assignment in the Surety Loan Agreement.

We acknowledge that the assignment in the Surety Loan Agreement elevated National Union's rights from the status of a third-party beneficiary (as articulated in the Bonus Fee Assignment) to that of an assignee. In that regard, however, the assignment in the Surety Loan Agreement cannot be viewed as irreconcilable with the third-party beneficiary designation in the Bonus Fee Assignment. Cf. Flatley, 632 A.2d at 1344 (where appellee sought construction of one paragraph of release which flatly conflicted with next paragraph of release, court invoked rule of construction that terms in contract should be read as consistent with one another, and one part should not be construed so as to nullify other terms). Indeed, for National Union to have any interest in the Bonus Fee Assignment, it had to be designated as a third-party beneficiary in that agreement, or at the very least clearly have been intended by the parties to the agreement to be its intended beneficiary, as it was not a party to that agreement. See Visor Builders, Inc. v. Devon E. Tranter, Inc., 470 F. Supp. 911, 923 (M.D. Pa. 1978) (noting that a third-party beneficiary is "one who, although not a party to the contract, and hence, not in privity with the promisor . . . is permitted to enforce the contract between the promisor and the promisee for its (the third-party beneficiary's) benefit").

As we set forth above, assignments in the Bonus Fee Assignment and the Surety Loan Agreement occurred sequentially and involved different assignors and assignees. Accordingly, the provisions of each assignment must be interpreted with that reality in mind. When viewed in that light, it is clear that the parties' designation of National Union as a third-party beneficiary in the Bonus Fee Assignment is wholly consistent with its later status as an

15

assignee in the Surety Loan Agreement, given the sequence of events and the contemplated structure of the overall transaction. Thus, we reject American's contention that the Surety Loan Agreement, if read as a complete assignment, is inconsistent with the third-party beneficiary designation in the Bonus Fee Agreement and Assignment.

Finally, there is nothing in the Surety Loan Agreement indicating that the parties intended that American's right to collect any delinquent payments owed to it, i.e. , 25% of the Base Fee, would be preserved. In any event, the Bonus Fee Assignment does not include a "reservation of rights" clause that theoretically could be imported into the Surety Loan Agreement so that the latter document could be interpreted as having reserved in American a right to sue Ahlstrom for 25% of the Base Fee. Paragraph three of the Bonus Fee Assignment merely declares Conduit's right (as assignee) to enforce payment of 24% of the Bonus Fee. Because Conduit assigned that right to National Union by virtue of the Surety Loan Agreement, the rights declared in paragraph three of the Bonus Fee Assignment cannot be imported into the Surety Loan Agreement. As previously mentioned, the Bonus Fee Assignment and the Surety Loan Agreement were two distinct documents with two distinct purposes. Thus, a clause in the former document cannot be imported wholesale into the latter so as to create an ambiguity where none exists on the face of the Surety Loan Agreement. In this regard we point out that even when several instruments pertaining to one transaction are considered together, the instruments do not become a single document for all purposes. See USX Corp. v. Prime Leasing Inc., 988 F.2d 433, 437-38 (3d Cir. 1993).

Additionally, as Ahlstrom correctly observes, American's right as a promisee under the Bonus Fee Agreement to sue the Partnership for unpaid Bonus Fees  is unhelpful in determining whether the Surety Loan Agreement similarly preserves American's right to sue Ahlstrom for unpaid Base Fees. As our emphasis indicates, there is language in the Bonus Fee Agreement that sets forth with particularity American's right to sue the Partnership, not Ahlstrom, should American not receive any portion of the Bonus Fee due under that agreement. Moreover, the right to sue,

16

which the Bonus Fee Agreement provides, is for the Bonus Fees, not the Base Fee. Accordingly, if we were to adopt American's "reasonable alternative interpretation" of these agreements, not only would we have to import language from the Bonus Fee Agreement to the Surety Loan Agreement, after we imported it we next would have to stretch and mangle the language to reach the conclusion that the Surety Loan Agreement's broad assignment also was intended to preserve American's right to sue Ahlstrom for the Base Fee. The parties are highly sophisticated and have demonstrated their ability to create third-party beneficiary rights when they saw fit, and to create an assignment where they deemed one appropriate. They will get no help from us in rewriting the plain terms of their agreements.

For each of these reasons, we find that these agreements, while part of the same transaction, clearly and purposefully accomplished distinct results. This conclusion renders the Bonus Fee Agreement, Bonus Fee Assignment and Surety Loan Agreement entirely consistent, and confirms our determination that the assignment in the Surety Loan Agreement unambiguously conveyed American's right to sue for 25% of the Base Fee to National Union.

Finally, we reject American's subsequent performance argument. While it does appear that Ahlstrom made a Base Fee payment to American in January 1996 after the execution of the Surety Loan Agreement, we see no significance to that payment as Ahlstrom was not a party to the agreement and it made the payment before the execution of the March 27, 1996 letter directing it to make payments to National Union.

IV. CONCLUSION

For the foregoing reasons we will affirm the district court's order of summary judgment entered October 16, 1998, to Ahlstrom. Plainly American does not have standing as the real party in interest under Fed. R. Civ. P. 17. American completely assigned its right to enforce payment under the 1993 Letter Agreement to National, and consequently, American lacks standing to sue Ahlstrom.

17

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit