**SEDONA CORPORATION, Plaintiff**

v.

**OPEN SOLUTIONS, INC., Defendant.**

**Civil No. 3:07CV00171 (TPS).**

United States District Court,
D. Connecticut.

Aug. 18, 2009.

---

A. Justin Ourso, III, Robert C. Tucker, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Baton Rouge, LA, David R. Schaefer, Rowena Amanda Moffett, Brenner, Saltzman & Wallman, New Haven, CT, George J. Murphy, Hecker Brown Sherry and Johnson LLP, Philadelphia, PA, for Plaintiff.

Adam J. Cohen, Adam S. Mocciolo, James T. Shearin, Pullman & Comley, Bridgeport, CT, David H. Colvin, Fox

Rothschild LLP, Philadelphia, PA, for Defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### [Dkts. ## 108, 114]

THOMAS P. SMITH, United States Magistrate Judge.

This is a breach of contract action arising out of a software licensing agreement entered into between plaintiff Sedona Corporation ("Sedona") and defendant Open Solutions, Inc. ("Open Solutions") brought solely on the basis of diversity jurisdiction.[1] The parties have filed cross-motions for summary judgment. (Dkts. ## 108, 114). Oral argument on both motions was held on June 19, 2009. For the reasons set forth below, Sedona's motion for partial summary judgment (dkt. # 108) is **DENIED in part** as to count one seeking a declaratory judgment, as to liability on counts two and three alleging breach of contract and as to counterclaim one. It is **GRANTED in part** as to counterclaims three and four. Open Solutions' motion for summary judgment (dkt. # 114) is **GRANTED in part** as to counts one, two and three and counterclaim one and **DENIED in part** as to counterclaim three. As a result of the court's ruling on counts one and two and counterclaim one, counterclaim two is moot.

## I. BACKGROUND[2]

Sedona is a software developer. In the late 1990's, Sedona developed a Customer Relationship Management program called "Intarsia," which enables financial institutions such as banks and credit unions to track and manage customer information.

Open Solutions is a software provider. As of May 2002, Open Solutions had become a core provider to financial institutions, supplying the software necessary to conduct customer account and transaction operations. Open Solutions approached Sedona to determine whether Intarsia could be offered as part of its customer relationship product, a suite of software tools marketed as "cView," standing for Complete View. On May 17, 2002, the parties entered into a Master Software Licensing Agreement ("the Agreement").

Pursuant to the Agreement, Open Solutions obtained a "paid-up, non-exclusive, perpetual license to copy, use, modify, create derivative works from, embed, market, sublicense, and resell the Licensed Products, described in each License Schedule, and the Source Code and Promotional Materials related thereto ...." (Dkts. ## 38, 115, Exh. A, Section 2.1). "Licensed Products" is a defined term under the Agreement, which includes the Intarsia software, also referred to as the machine-readable or object code, the source code or human-readable form of the software and related documentation. (Id., §§ 1.6, 1.11, 1.16 and 1.17). In exchange, Open Solutions agreed to pay Sedona $50,000 upon execution of the Agreement "for purchase of [the] software code and the rights related thereto" plus continuing royalty payments on "Licensed Product Sales." (Id., § 3.1 & License Schedule No. 1 § 5). "Sale" is defined as "a license or sublicense of a Licensed Product by Licensee." (Id., § 1.15).

One of the important rights that Open Solutions obtained via the license was the right to create "Licensee Enhancements"

---

1. Sedona is a Pennsylvania corporation with a principal place of business in Pennsylvania. Open Solutions is a Delaware corporation with a principal place of business in Connecticut. The amount in controversy exceeds $75,000.

2. The following undisputed facts are taken from the Local Rule 56(a) statements, summary judgment briefs and evidence submitted by the parties.

from the Licensed Products. As stated above, the license granted Open Solutions not only the right to "market, sublicense and resell" the Licensed Products, but also to "modify [and] create derivative works" from them. The scope of this right is addressed in Section 4.2, which defines Licensee Enhancements as "[a]ny modifications, enhancements, alterations or derivative works." Pursuant to Section 4.2, Open Solutions could create Licensee Enhancements in its "sole discretion" and "independently of [Sedona]." Section 4.2 further provides that "[a]ll Licensee Enhancements will be the sole and exclusive property of [Open Solutions] and [Open Solutions] shall be the sole and exclusive owner of the Licensee Enhancements and all right, title and interest thereto in perpetuity . . . ." Open Solutions was under no obligation "to disclose to or share with" Sedona any Licensee Enhancements and could, in turn, license any Licensee Enhancements to Sedona. Under Section 4.2, Open Solutions could rely on consultants or agents to create Licensee Enhancements "to the extent that they [were] permitted access pursuant to Section 6." Section 6 sets forth the parties' confidentiality obligations.

After entering into the Agreement, Open Solutions customized and re-branded Intarsia as cView, selling it in a Java platform ("cView(Java)"). From late 2002 through August 2004, Open Solutions paid $594,179.43 in royalties to Sedona on sales of cView(Java). During this time, in 2003, Open Solutions subcontracted with an Indian company, R Systems, Inc. ("R Systems"), to rewrite the cView program from a Java to a Microsoft.net software plat-

form.[3] In order to complete the project, Open Solutions provided R Systems with a server that included the Intarsia source code and object code as well as software documentation. The code rewrite took over one year and 42,000 hours, with additional time spent by Open Solutions after R Systems' involvement. The resulting product incorporated the basic design and functionality of Intarsia with a change to the .net code language, a new architectural layer to access and process data developed by Open Solutions and updated functionality. Open Solutions entered into a total of three agreements with R Systems at various stages of the project that included confidentiality provisions. Once Open Solutions began to market and sell cView to its customers in a .net platform ("cView(.net)"), it ceased marketing the product in the Java platform and paying royalties to Sedona.

Sedona brought this action seeking a declaratory judgment (Count I) that Open Solutions is required under the Agreement to pay royalties on sales of cView(.net) and asserting claims for breach of contract arising from Open Solutions' failure to pay royalties (Count II) and disclosure of confidential information (Count III). (Dkt. # 37, Amended Complaint).[4] Open Solutions counterclaimed seeking a declaratory judgment that cView(.net) is 1) a Licensee Enhancement not subject to royalties (Counterclaim I) and 2) was independently developed and therefore not subject to royalties (Counterclaim II). Open Solutions also asserts claims for breach of contract arising from Sedona's demand for royalty payments (Counterclaim III) and

---

**3.** Software programs operating in the Java environment are written in the Java language. Programs operating on a Microsoft.net platform are written in the C# (C Sharp) language, a Microsoft developed language that is different from the Java language.

**4.** Sedona brought suit in Pennsylvania state court. The case was removed to the United States District Court for the Eastern District of Pennsylvania and then transferred to the District of Connecticut. The parties have consented to jurisdiction by this Magistrate Judge. (See dkts. ## 19, 20, 65).

its disclosures relating to the Agreement (Counterclaim IV). (Dkt.# 42, Answer). Sedona has moved for summary judgment as to count one seeking a declaratory judgment and as to liability on its breach of contract claims as well as summary judgment on Open Solutions' counterclaims. Open Solutions has filed a cross-motion for summary judgment on counts one through three and counterclaims one and three. Additional facts will be set forth as necessary for the resolution of the parties' particular claims.

## II. SUMMARY JUDGMENT STANDARD

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in its favor. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Id.* at 38. "When reasonable persons, applying the proper legal standards, could differ in the responses to the question" raised on the basis of the evidence presented, the question is best left to the factfinder. *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

■ "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other.... Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (citation omitted).

## III. DISCUSSION

■ The Agreement is governed by Pennsylvania law. (Dkt. # 115, Exh. A, Section 13.9).[5] Under Pennsylvania law, in order to prevail on a breach of contract claim, a plaintiff must establish: 1) the existence of a contract, including its essential terms, 2) a breach of a duty imposed by the contract, and 3) resultant damages. *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225 (3d Cir.2003) (citation omitted).

■ Where the question is one of contract interpretation, "[t]he fundamental rule ... is to ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429 (2001). "The court first determines whether the contract is ambiguous." *Pacitti v. Macy's,* 193 F.3d 766, 773 (3d Cir. 1999). "A contract provision is ambiguous if it is susceptible of two reasonable alternative interpretations." *Hullett v. Towers, Perrin, Forster & Crosby,* 38 F.3d 107, 111 (3d Cir.1994). The court can grant sum-

---

**5.** Section 13.9 provides: "This Agreement and any and all claims, disputes, and other matters in question arising out of or relating to this Agreement, or breach thereof shall be governed by the laws of the Commonwealth of Pennsylvania."

mary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 452 (3d Cir.2006) (citation omitted).

■ "In determining whether a contract is ambiguous, the court assumes the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Pacitti*, 193 F.3d at 773 (internal citations and quotations omitted). "[A] determination whether the language of an agreement is unambiguous may not be possible without examining the context in which the agreement arose." *Hullett*, 38 F.3d at 111. The court may "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Id.* (citation omitted).

■ In construing the terms of a contract, "the court must read the contract in its entirety, giving effect to all of the contractual language if at all possible." *Benchmark Group, Inc. v. Penn Tank Lines, Inc.*, 612 F.Supp.2d 562, 579 (E.D.Pa.2009). In addition, "[t]he Court should not consider individual terms unmoored from their context but should instead consider the entire contractual provision to determine the intent of the parties." *Norfab Corp. v. Travelers Indemn. Co.*, 555 F.Supp.2d 505, 509 (E.D.Pa.2008).

## A. Royalty Payments

■ The parties dispute whether cView(.net) is subject to royalties under the Agreement. Sedona contends that Open Solutions is required to pay royalties on its sales of cView(.net) because Licensed Products were used in the development of cView(.net) and cView(.net) retains

the basic functionality of the Licensed Products. It argues that royalties are due under the Agreement for the "use of Licensed Products" and that there is no language in the Agreement that eliminates the obligation to pay royalties when the use of Licensed Products is in connection with Licensee Enhancements. Open Solutions maintains that cView(.net) is a Licensee Enhancement that is non-royalty-bearing under the Agreement.

Considering the Agreement as a whole, the court determines that it clearly and unambiguously limits the payment of royalties to the Licensed Products and does not provide for the payment of royalties for the use of Licensed Products or with respect to Licensee Enhancements. The right acquired by Open Solutions to create Licensee Enhancements was an integral part of the Agreement, provided for in the initial license grant under Section 2.1 and expanded upon in Section 4.2. Licensee Enhancements, defined under Section 4.2 as "[a]ny modifications, enhancements, alterations or derivative works," are distinct from Licensed Products under the Agreement. (See dkts. ## 38, 115, Exh. A, §§ 1.12 and 4.2). As defined and as the parties acknowledge, the creation of Licensee Enhancements would necessarily involve the use of Licensed Products. Moreover, the degree of such use is not specified; any degree of change, however slight, constitutes a Licensee Enhancement and, conversely, a Licensee Enhancement could substantially retain Licensed Products. Despite this expansive definition of Licensee Enhancements, the Agreement does not address a combined use of Licensed Products and Licensee Enhancements.

In addition, Section 4.2 clearly establishes Open Solutions' "sole and exclusive" proprietary and ownership rights in the Licensee Enhancements. Under Section

4.2, Open Solutions could create Licensee Enhancements independently of Sedona, with no obligation of disclosure, that it could, in turn, license to Sedona. (Id., § 4.2). In contrast to this language evidencing ownership and control, Section 4.2, the main provision concerning Licensee Enhancements, is silent as to royalties.

In support of its argument that use of the Licensed Products subjects Licensee Enhancements to royalties, Sedona relies in large part on Section 3.1, the payments provision. This provision states in relevant part: "[t]he total price *for use of the Licensed Products* and Maintenance Services ... will be the price for such Licensed Products set forth in the applicable License Schedule ...." (Dkts. ## 38, 115, Exh. A, § 3.1) (emphasis added). The phrase "for use of the Licensed Products," however, cannot be isolated from the entire context of Section 3.1. *See Norfab,* 555 F.Supp.2d at 509 (court should not consider individual terms removed from their context, but should consider the entire contractual provision to determine the parties' intent). As a whole, Section 3.1 concerns the terms of payment and, principally, the timing of payment. The License Schedule, which Section 3.1 references, sets forth the "[f]ees for Licensed Products and for Initial Services." Under the License Schedule, the obligation to pay continuing royalties attaches to the sales of Licensed Products, i.e. a license or sublicense of the Intarsia software and related documentation. (Dkts. ## 38, 115, Exh. A, § 1.15 and License Schedule No. 1, § 5). Neither Section 3.1 nor the License Schedule mention Licensee Enhancements or provide that royalties are due for the use of Licensed Products.

Sedona further draws a distinction between payment and ownership under the Agreement. It argues that Section 4.2 is merely an ownership provision and not a payment provision. According to Sedona,

Section 4.2 only grants Open Solutions ownership rights with respect to Licensee Enhancements, not the Licensed Products. Had the intention been to exempt Licensee Enhancements from the royalties due for the use of Licensed Products as established in Section 3.1, Sedona argues, express language releasing Open Solutions from the obligation to pay royalties on Licensee Enhancements would have been used in Section 4.2. Sedona's argument is unavailing. Sedona is a sophisticated business entity that could have negotiated to include a contractual provision subjecting Licensee Enhancements to royalties to the extent that they are developed through the use of Licensed Products or incorporate aspects of the Licensed Products. It did not do so and "[i]t is not the province of the court to alter [the] contract by construction or to make a new contract for the parties." *SmartTran, Inc. v. Alpine Confections, Inc.,* No. 07–381, 2008 WL 5263338, *4 (W.D.Pa. Dec. 17, 2008) (citation omitted).

The Agreement clearly contemplated the use of Licensed Products in the creation of Licensee Enhancements. It does not, however, address the consequences of such use with respect to royalties. It further does not provide that Licensee Enhancements are in any way subject to royalties. Open Solutions is therefore entitled to a declaratory judgment that cView(.net), as a Licensee Enhancement, is non-royalty-bearing under the Agreement. (Counterclaim I). Sedona's motion for partial summary judgment on count two claiming breach of contract as a result of Open Solutions' non-payment of royalties on its sales of cView(.net) is denied and Open Solutions' motion for summary judgment on count one, seeking a declaratory judgment that cView(.net) is subject to royalties, and count two is granted.

## B. Disclosure of Confidential Information

■ Sedona also claims that Open Solutions improperly disclosed confidential information to R Systems in breach of Section 6 of the Agreement. Under Section 6.1, the parties agreed not to disclose information deemed confidential to third parties without the other party's prior written consent. As one of two exceptions, Section 6.1 provides that confidential information may be disclosed to "any subcontractor or agent of recipient as necessary for performance hereunder, provided that, such subcontractor, or agent of recipient has entered into a written agreement with the receiving party, pursuant to which they are bound to confidentiality provisions comparable to those contain[ed] in this Section 6." As noted above, in order to rewrite the code to the .net language, Open Solutions provided R Systems with the Intarsia software and related documentation, which had been designated confidential information. Open Solutions entered into three different agreements with R Systems at various stages of the rewrite project, all containing confidentiality provisions. Only the second agreement, dated November 17, 2003, is relevant to this dispute.[6] (Dkt. # 116, Exh. 12 (filed under seal)).

Sedona's claim raises two issues with respect to the disclosure: 1) whether Open Solutions' disclosure to R Systems falls within the "necessary for performance hereunder" language of Section 6.1 and 2) whether the confidentiality provisions contained in the second agreement entered into between Open Solutions and R Systems are comparable to Section 6. In addition, Sedona asserts that, as a result of the improper disclosure, cView(.net) is not an authorized Licensee Enhancement under Section 4.2 of the Agreement, which provides that Licensee Enhancements may be created through consultants or agents "to the extent that they are permitted access pursuant to Section 6." Open Solutions maintains that it properly disclosed information to R Systems because such disclosure was necessary to exercise its right under the Agreement to create Licensee Enhancements and was done pursuant to agreements with comparable confidentiality provisions.

The court first addresses whether Open Solutions' disclosure was within the "necessary for performance hereunder" language of Section 6.1. Relying on the legal definition of performance, Sedona argues that this language should be read as permitting disclosures to subcontractors or agents only when necessary, or required, to fulfill the obligations under the Agreement. Sedona contends that Open Solutions' disclosure to R Systems was not necessary to perform its technical, marketing or royalty obligations under the

6. The code was rewritten pursuant to the second agreement and it was under this agreement that the information related to Intarsia was disclosed. (Dkt. # 112, Exh. A at 153–54 (referencing November 17, 2003 agreement) (filed under seal); (dkt. # 116, Exh. 12) (filed under seal)). The first agreement is a non-disclosure agreement, dated June 16, 2003, that was superseded by the second agreement. (See Dkt. # 116, Exh. 21, § 4(e) (filed under seal)). The third agreement, dated March 21, 2005, was entered into after the code rewrite had been completed and contains the same confidentiality provisions as the second agreement. (See dkt. # 116, Exh. 22, § 13 (filed under seal)). In addition, Sedona argues, in part, that the third agreement does not adequately protect its confidential information because it permits R Systems to release a product with substantially the same functionality after two years. The applicable provision of the agreement, however, concerns the development of products with similar functionality for other vendors and expressly states that it does not alter the provisions addressing confidentiality. (See id., § 15).

Agreement. Such a limited interpretation, however, is not supported either by the language itself or the Agreement as a whole.

As discussed above, the Agreement not only imposed obligations on Open Solutions, but also conveyed to it important rights with respect to Licensee Enhancements under Sections 2.1 and 4.2. Indeed, the right of Open Solutions to create Licensee Enhancements is a fundamental part of the Agreement. There is no language in Section 6.1, or any other provision of the Agreement, that limits the words "necessary for performance hereunder" to mean the fulfillment of obligations. As previously noted, Sedona could have included such contractual language and did not do so. In addition, under Section 4.2, Open Solutions' right to create Licensee Enhancements is largely unrestricted. Open Solutions was permitted to create Licensee Enhancements in its sole discretion, independently of Sedona, and with no obligation of disclosure. Further, it could do so through consultants or agents "permitted access" under Section 6. Under Section 6, subcontractors and agents are permitted access to confidential information when they have entered into agreements with comparable confidentiality provisions. Interpreting the words "necessary for performance hereunder" as allowing disclosure only to fulfill obligations under the Agreement, thereby requiring prior written consent when creating Licensee Enhancements through third parties, reads out of Section 4.2 the broad rights that Open Solutions obtained with respect to Licensee Enhancements. The only reasonable interpretation, giving effect to both Sections 4.2 and 6.1, is that "necessary for performance hereunder" incorporates both Open Solutions' right to create Licensee Enhancements as well as its obligations un-der the Agreement with respect to the Licensed Products.

■ The court next considers the comparability of the confidentiality provisions in the second agreement between Open Solutions and R Systems ("R Systems agreement") and Section 6. In doing so, the court turns to the terms of the R Systems agreement. The R Systems agreement designated as confidential, inter alia, the terms and conditions of the agreement, the source code and engineering specification for cView(.net) and any proprietary information relating to cView(.net). (Dkt. # 116, Exh. 12, § 13.2) (filed under seal). Although its terms are limited to cView(.net), the provisions of the R Systems agreement necessarily protected Sedona's confidential information relating to Intarsia as the cView(.net) product was developed from the Intarsia software and documentation, including the source code. The R Systems agreement additionally prohibited the use of confidential information for purposes other than those necessary to directly further its purposes, i.e. the code rewrite, and required written consent prior to any disclosure to third parties without exception. (See id., § 13.1). The R Systems agreement, by its terms, clearly extended the obligation of Open Solutions under Section 6 to maintain the confidentiality of Sedona's information to R Systems. To the extent that the R Systems agreement protected Sedona's confidential information, the confidentiality provisions of the R Systems agreement and Section 6 are therefore comparable.

Open Solutions' disclosure of confidential information to R Systems to develop cView(.net) was therefore within the applicable exception to the prior written consent requirement under Section 6.1 as it was "necessary for performance hereun-der" and accompanied by agreements with

comparable confidentiality provisions. Consequently, Sedona's argument that cView(.net) is not an authorized Licensee Enhancement under Section 4.2 fails. With respect to count three, Sedona's motion for partial summary judgment is therefore denied and Open Solutions' motion for summary judgment is granted.

## C. Remaining Counterclaims

The court now addresses Open Solutions' three remaining counterclaims. In its second counterclaim, Open Solutions seeks a declaratory judgment that cView(.net) was independently developed and is not substantially similar to Intarsia and, therefore, is non-royalty-bearing. In view of the court's finding that cView(.net), as a Licensee Enhancement, is not subject to royalties in ruling on counts one and two and counterclaim one, Open Solutions' second counterclaim is moot.

■■■ In its third counterclaim for breach of contract, Open Solutions alleges that Sedona's demand for royalties on the sale or distribution of cView(.net) constitutes a breach of its representations under the Agreement that only Licensed Products would be subject to royalties, not Licensee Enhancements. Open Solutions contends that Sedona expressly represented that Open Solutions had the right to create Licensee Enhancements that would be non-royalty-bearing. The Agreement, however, does not expressly provide that Licensee Enhancements are non-royalty-bearing. Indeed, the provisions addressing Licensee Enhancements are silent as to royalties and the question of whether cView(.net), as a Licensee Enhancement, is subject to royalties has only been determined as a result of the court's interpretation of multiple provisions of the Agree-

ment. Sedona's motion for summary judgment on Open Solutions' third counterclaim is therefore granted and Open Solutions' cross-motion for summary judgment on this counterclaim is denied.

■■■ Open Solutions' fourth counterclaim asserts a breach of contract claim on two grounds. First, Open Solutions claims that Sedona breached Section 13.4 of the Agreement by referring to Open Solutions as a partner on its website and in shareholder meetings. Section 13.4 is a disclaimer provision that expressly states that the Agreement does not constitute a partnership agreement. This provision defines the parties' legal relationship as independent contractors as opposed to that of employees, partner, agent or joint venturers and limits their respective liability. Sedona's use of the word "partner" to refer to the parties' business relationship in the colloquial sense does not constitute a breach of this provision. (See dkt. # 127, Shearin Aff., Exhs. 12 and 15 A).

■■■ Second, Open Solutions claims that Sedona breached Section 13.5, which prohibits Sedona from disclosing the terms of the Agreement without Open Solutions' prior written approval.[7] Open Solutions alleges three instances in which Sedona improperly disclosed the terms of the Agreement. First, Open Solutions refers to Sedona's statement on its website that it had entered into a license agreement pursuant to which Open Solutions would embed Intarsia into its cView product. (Id., Exh. 12). This statement merely discloses the fact and nature of the parties' Agreement, not its actual terms. Next, Open Solutions refers to statements made in annual shareholder meetings informing shareholders of developments related to

---

**7.** Section 13.5 provides: "[Sedona] and [Open Solutions] shall jointly agree upon the language of any press release or other public announcement of the Agreement. [Sedona] agrees to not disclose the terms of this Agreement without [Open Solutions'] prior written approval."

the cView product and the dispute between the parties with respect to royalty payments. (Id., Exh. 15 A & B). Again, none of the identified statements disclose the terms of the Agreement. Last, Open Solutions contends that Sedona improperly provided a copy of the Agreement to David Vey, who was a shareholder and lender at the time and subsequently chairman of the board of directors, who then disclosed it to his investment consultant, Cloyses Partners. Section 13.5, entitled "publicity and advertising," addresses public disclosures. This was a limited disclosure of the Agreement in order to secure financing accompanied by non-disclosure and confidentiality agreements and, as such, it does not constitute a breach of Section 13.5. (See dkts. # 146, Exh. C; # 147, Vey Decl.). Moreover, even assuming that Sedona improperly disclosed the terms of the Agreement under Section 13.5 in this instance, Open Solutions cannot establish damages. Open Solutions alleges damage to its reputation, but has not provided any evidence of harm to its reputation as a result of this disclosure, particularly in view of the fact that this was not a public disclosure. *See Crown Coal & Coke Co. v. Compass Point Resources, LLC,* No. 07–1208, 2009 WL 1806659, at *7 (W.D.Pa. June 23, 2009) (claim for damage to reputation must be supported by evidence of actual harm to reputation).

For the foregoing reasons, Sedona's motion for summary judgment on counterclaim four is granted.

## IV.  CONCLUSION

The Agreement in this case was generated by Sedona. At oral argument it was further suggested that the Agreement was based upon an earlier contract between Sedona and an unrelated customer, which was used as a template. The result is that the language of the Agreement does not support Sedona's interpretation, but rather supports Open Solutions'. Were this a case where ambiguous language were capable of competing reasonable interpretations, summary judgment would be inappropriate. But this is not such a case. This is a case involving a contract whose only reasonable interpretation is Open Solutions', unless the court were to "write in" terms favoring Sedona while ignoring terms unfavorable to it. That a contract is poorly drafted does not automatically qualify it as presenting disputed issues of material fact.

Sedona's motion for partial summary judgment (dkt. # 108) is **DENIED in part** as to count one requesting a declaratory judgment, as to liability on counts two and three alleging breach of contract and as to counterclaim one. It is **GRANTED in part** as to Open Solutions' third and fourth counterclaims. Open Solutions' motion for summary judgment (dkt. # 114) is **GRANTED in part** as to counts one, two and three and as to counterclaim one seeking a declaratory judgment and **DENIED in part** as to counterclaim three. In view of the court's ruling on counts one and two and counterclaim one, Open Solutions' second counterclaim is moot.

**IT IS SO ORDERED.**