NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No.  08-1957

———————

ANTHONY DEFRANCO,
                                        Appellant

v.

SUPERINTENDENT WILLIAM  WOLFE; STEVE REILLY; DENISE
BUNNER, individual and official capacity; MANAGER ROD SHOWERS,
individual and official capacity; CASE MGR- GECAC JUDY JACKSON,
individual and official capacity also known as COUNSELOR JUDY
JACKSON; DR. JOHN DOE, individual and official capacity; JANE DOE
individual and official capacity, ASST. TO SUPER. WILLIAM BARR,
sued in his official and individual capacity; SUPERINTENDENT JOHN
PALAKOVICH, sued in his individual and  official capacity; FRANZ
BAUER, sued in his individual and official capacity; HEALTH CARE
GEORGE WEAVER, sued in his official and individual capacity;
PHYSICIAN ASST. P.A. HOFFMAN, sued in his individual and official
capacity; JEFFREY BEARD, SECRETARY OF DEPARTMENT OF
CORRECTIONS, sued in his individual and official capacity; ASSIST.
SUPER. WILLIAM BARR, sued in his individual and official capacity;
MARILYN BROOKS, CURRENT SUPERINTENDENT, sued in her
individual and official capacity

———————

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 1-04-cv-00230)
District Judge: Honorable Maurice B. Cohill, Jr.

———————

Argued November 9, 2009

Before: AMBRO, GARTH, and ROTH, Circuit Judges

Thomas S. Jones, Esquire
Margaret C. Gleason, Esquire (Argued)
Jean M. Mosites, Esquire
Kevin C. Meacham, Esquire
Jones Day
500 Grant Street, Suite 4500
Pittsburgh, PA   15219-0000

       Counsel for Appellant

Thomas W. Corbett, Jr.
   Attorney General
Kemal Alexander Mericli (Argued)
   Senior Deputy Attorney General
Calvin R. Koons
   Senior Deputy Attorney General
John G. Knorr, III
   Chief Deputy Attorney General
Appellate Litigation Section
Office of the Attorney General of Pennsylvania
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA   15219-0000

       Counsel for Appellees

—————

OPINION

—————

AMBRO, <u>Circuit Judge</u>

Anthony DeFranco brought a § 1983 suit against various prison officials and staff

at the State Correctional Institution at Albion ("SCI-Albion").  Among other things, his

complaint alleged (1) retaliatory removal of single-cell status; (2) retaliatory transfer; and

2

(3) double-celling in violation of the Eighth Amendment, the three claims that are the subject of this appeal. He appeals the District Court's grant of summary judgment in favor of defendants. Though this is a close call in part, we believe that DeFranco has not raised genuine issues of material fact on any of his claims. Accordingly, we affirm the judgment of the District Court.

## I. Factual and Procedural Background

The facts in this case, summarized below, span five years in numerous correctional facilities, much of it spent in litigation.

### A. DeFranco arrives at SCI-Albion

DeFranco is currently serving his sentence at SCI-Albion, having been transferred there in October 1999. Prior to his arrival, he had been housed in a single-cell unit due to his inability to cope with having a cellmate. Although he was initially housed with other cellmates at SCI-Albion, his inability to cope with cellmates led prison officials to confer him with "Z-code" status and place him in a single cell on February 7, 2000. ("Z-code" status is the designation given to an inmate who is deemed to require placement in a single cell.) The Z-code was initially conferred on the recommendation of the Chief Psychologist at SCI-Albion, Steve Reilly.

### B. DeFranco's Z-code status is removed

On March 24, 2002, DeFranco threatened to kill a corrections officer and received a misconduct. He was then placed in the prison's restricted housing unit until April 2002,

at which time he was assigned to a different housing unit at SCI-Albion to separate him from the corrections officer he had threatened.

Shortly after arriving in the new housing unit, DeFranco claims he made a comment to Rod Showers, the unit manager, about suing the institution for losing a pair of his tennis shoes. Showers responded, according to DeFranco, that he would see how the Department of Corrections "deals with inmates who sue." Within ten days, a review of DeFranco's Z-code status began, and the committee in that unit, including Showers and a counselor named Judy Jackson, voted to remove DeFranco's Z-code status.

DeFranco alleges that Jackson spoke with the Psychology Department to implement the process of removing the Z-code. The psychologist who evaluated DeFranco saw him only one time in May 2002, and she wrote her report a few weeks later in June 2002. She found DeFranco condescending, and believed that medication would adequately treat his medical needs. There was no psychiatric referral at that time, and Chief Psychologist Reilly was not consulted about removing the Z-code even though he regularly consults on Z-code approvals and removals, and he recommended the initial designation in 2000.

DeFranco's Z-code status was removed in June 2002. Although each inmate receives an annual review, the removal here allegedly occurred at an "interim staff[ing] [recommendation]" meeting not part of a scheduled annual review.

### C. DeFranco's requests to reinstate his Z-code

4

For the next two years, Defranco repeatedly asked prison officials to reinstate his Z-code designation without success. On September 23, 2002, DeFranco's treating prison psychiatrist, Dr. Angela Lindemuth, wrote a letter to the Z-code committee. She had treated DeFranco's panic disorder and generalized anxiety for several years, and had previously prescribed medication to manage his symptoms. Because double-celling would "only serve to fuel his brewing anger and agitations . . .[,] likely result[ing] in an explosive rage," she recommended that the status be reinstated. No reinstatement was made at that time.

On March 10, 2004, another vote on his Z-code was held at DeFranco's request. Reilly and DeFranco's new counselor, Karla Webb, voted to reinstate the Z-code, but three others voted against reinstatement. On August 20, 2004, Dr. Lindemuth again wrote a letter to the Z-code committee recommending reinstatement, but this was also unsuccessful.

D.     **DeFranco files a civil rights action and receives a temporary restraining order**

On August 10, 2004, DeFranco filed this lawsuit. In his initial complaint, he sued William Wolfe, the former Superintendent at SCI-Albion; Reilly; Denise Bunner, another psychologist at SCI-Albion; Showers; Jackson; unnamed defendants Jane Doe and Dr. John Doe; and Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections. Later that month, he filed a motion for a preliminary injunction to reinstate his Z-code

5

status. He also sought a temporary restraining order (TRO) in September 2004 seeking the same status.

A telephone hearing on the TRO was held on October 22, 2004, during which evidence was presented by both DeFranco and the prison officials. DeFranco claimed his placement in a double cell with another inmate had exacerbated his pre-existing heart condition, which required him to increase his dosage of heart and anxiety medication. Specifically, he claimed that he did not need nitroglycerin tablets, aspirin, and Lopressor prior to double-celling. He also presented a report from Lindemuth that recommended single-celling, which the Magistrate Judge noted was Lindemuth's "professional opinion."

The prison officials denied that DeFranco's medical records reflected a need for single-celling and also denied that he was in danger of suffering irreparable harm as a result of his placement in a double cell. William Barr, SCI-Albion's Superintendent's Assistant, represented to the District Court that "[w]e can actually shift [DeFranco] to a Z Code cell if necessary." He also claimed that "there was quite a movement afoot here to actually transfer him, and we were able to lobby and keep Mr. DeFranco here because it's close to his home and family."

No ruling was made on October 22. Four days later, DeFranco filed a second petition for a TRO. He claimed that, immediately following the telephone hearing, he was told by Barr that "there will probably be a single cell available for you at SCI-

Dallas[, PA]." DeFranco interpreted this as a threat to transfer him, and sought a TRO to prevent prison officials from effecting a transfer to another facility in retaliation for his Z-code challenge.

The District Court granted the TRO on November 2, 2004, ordering that DeFranco's Z-code status be reinstated immediately and that he be placed in a single cell at SCI-Albion.

### E. DeFranco's motion for a preliminary injunction is denied

A hearing was held on the motion for a preliminary injunction on December 17, 2004. Lindemuth, Webb, and Nurse Sue Ann Rebele testified, and Barr submitted an affidavit in lieu of live testimony. They largely eliminated the District Court's concerns regarding the likelihood of irreparable harm that would be caused to DeFranco if he were placed in a double-cell.

Webb testified that she voted for a Z-code after discussing it with Lindemuth. Lindemuth testified that the "primary purpose" for writing her recommendation in 2002 was as "a kind of supportive therapy," and that she did not intend for it to be used in court. Nonetheless, she stood by her recommendation, one of only four or five such recommendations she has ever written. She attributed the scarcity of recommendations to her belief that they would not be followed by prison officials. She also testified that, while she believed DeFranco would benefit from a single cell in addressing his anxiety, such a benefit would be common to many inmates and was an inherent problem of

7

overcrowding. Finally, she stated that Barr told her the letter was "dangerous precedent" that "was going to open the floodgate."

Rebele testified to the substance of the conversation between Barr and DeFranco following the October 22, 2004, telephone hearing. She believed the quote attributed to Barr was taken out of context, and "the conversation was that if SCI-Albion had no single cells, in order for [DeFranco] to get a single cell, the possibility of a transfer to SCI-Dallas or another prison would be possible." After DeFranco contested Rebele's account and alleged she was not present during the conversation he had with Barr, Rebele admitted to leaving the room numerous times (though she maintained she was present at the time of the alleged threat by Barr to transfer DeFranco).

Barr's affidavit stated that DeFranco was going to be transferred following his 2002 threat to a guard, but that the administrative staff decided to allow him to remain close to his family. He stated that DeFranco had demonstrated an ability to interrelate with other inmates without being disruptive, even without Z-code, while continuing to receive medical treatment. With respect to the October 22 conversation, Barr sought to clarify his remarks. He recalled telling DeFranco after the hearing that, if he were given a Z-code, he "could not guarantee that the cell would be at SCI-Albion" due to the practice of looking at the Department of Corrections as a whole for bed space. Barr stated he explained to DeFranco "that the single cell could be, for instance, at SCI-Dallas," and that it "was not said in any way to communicate a threat." Finally, Barr claimed that any

8

representation there was an existing opening in Z-code cells at SCI-Albion was a misinterpretation, apparently referring to a statement made during the TRO hearing by telephone.

On January 19, 2005, the Magistrate Judge recommended that the preliminary injunction be denied. On February 28, 2005, the District Court agreed, finding no irreparable harm from double-celling, and it denied the motion for a preliminary injunction.

### F.     DeFranco is transferred to SCI-Smithfield following the hearing

In mid-February 2005, Barr requested that DeFranco be transferred. The transfer order gave Barr's reasons:

> An Administrative/Separation transfer is being requested due to litigation against William Barr, SCI-Albion's Superintendent's Assistant. Mr. Barr is the Institutional Grievance Coordinator and doesn't want any potential problems between the inmate and future potential grievances.

The request was approved on February 23, 2005, and DeFranco was transferred to SCI-Smithfield on March 8, 2005. As a result of the approved transfer, he filed a grievance, which was responded to on March 28, 2005. The response stated:

> Mr. DeFranco has a formal separation in place from Mr. Barr. It is felt that based on pending litigation it is in the best interest of all parties that he not be housed at SCI-Albion . . . .

Upon arrival at SCI-Smithfield, DeFranco was given temporary Z-code status, and this status was renewed after a review was held to determine his progress. The report granting the Z-code noted that the transfer from SCI-Albion was "due to litigation

9

DeFranco filed against Mr. Barr. Mr. Barr did not want future potential problems between the inmate and future potential grievances."

Notwithstanding this rationale undergirding the transfer request, Marilyn Brooks, the current Superintendent at SCI-Albion, had DeFranco returned to SCI-Albion on August 2, 2005. Five weeks later, DeFranco added to his complaint a second claim against Barr.

### G. More evidence is taken

Over the next few months, other pretrial matters were addressed and additional materials were filed in support of cross-motions for summary judgment. Three affidavits filed during this time are of particular relevance.

Lindemuth filed another affidavit reiterating her opinion that DeFranco not be double-celled for his own safety and the safety of any cellmate. She added that she believed the resulting anger would cause irreparable harm to his pre-existing heart condition.

Barr filed another affidavit as well. He attempted to clarify his October 2004 statement at the telephone hearing, stating that his intent was "to explain what could be done at Albion on a temporary basis, if so ordered by the Court. If the Court understood my response to suggest anything else, i.e., that Albion had a permanent Z-code cell opening, I regret not being clearer." He explained that when he was ordered to put DeFranco in a single cell, he (Barr) vacated a different cell to do so. He reiterated that he

10

did not intend to threaten DeFranco by telling him there might be an empty cell at SCI-Dallas, but only intended to convey he could not guarantee that a single cell would be available at SCI-Albion. Barr also sought to explain the reasons behind the February 2005 transfer order, stating he "grew concerned that Mr. DeFranco would not be able to accept any decision or recommendation by me or other staff, particularly in the grievance context," and that his (Barr's) "effectiveness would be compromised, particularly as a grievance counselor." The transfer, he claimed, "was not intended to punish or retaliate against DeFranco for filing his lawsuit or pursuing his claim for Z-Code status." Instead, Barr opined that "DeFranco would never believe that he was getting a fair shake at SCI-Albion."

DeFranco's brother, Dr. Richard J. DeFranco, M.D., submitted a report in which he opined that single-cell status was medically necessary for his brother due to his pre-existing heart condition and his psychological inability to live with another person.

## H.     The District Court rules against DeFranco on all claims at summary judgment

On February 28, 2007, the Magistrate Judge filed a Report and Recommendation. She concluded that there was a genuine issue of material fact concerning the retaliatory transfer claim against Barr, but recommended summary judgment be entered against DeFranco on the other claims for failure to exhaust administrative remedies.

On June 12, 2007, the District Court issued a Memorandum Order (the "First

11

Order"). The Court agreed with the Magistrate Judge regarding the retaliatory transfer claim against Barr, finding that there were genuine issues of material fact. It disagreed with the Magistrate Judge regarding the exhaustion of administrative remedies, and recommitted the matter to her to evaluate the remaining arguments on the other claims.

On November 8, 2007, the Magistrate Judge issued a Second Report and Recommendation. No new evidence regarding the merits of the claims was taken between the District Court's June 2007 Order and the Second Report and Recommendation. The Magistrate Judge determined that there were genuine issues of material fact for two of the remaining claims, the Eighth Amendment claim related to the removal of (and the refusal to reinstate) his Z-code status, and the First Amendment retaliation claim related to the removal of the Z-code in retaliation for the threat to sue.[1]

On March 4, 2008, the District Court issued a Second Opinion and Order (the "Second Order"). No new evidence was taken prior to this Order. The Court rejected the Magistrate Judge's Second Report and Recommendation, and granted summary judgment on both the Eighth Amendment claim and the First Amendment retaliatory removal of Z-code claim. The Court took the further step of reconsidering *sua sponte* its prior ruling on the First Amendment retaliatory transfer claim. It now was "convinced that summary

[1] The Magistrate Judge also determined that summary judgment should be entered against DeFranco on the First Amendment retaliation claim related to the removal of the Z-code in retaliation for threatening to kill a corrections officer, but that claim is not before us on this appeal.

judgment [was] appropriate," vacated the First Order insofar as it denied summary judgment and found genuine issues of material fact, and granted summary judgment in favor of the defendants. This appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331 to hear the claim arising under 42 U.S.C. § 1983. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the grant of summary judgment by the District Court, and we apply the same test that the District Court should have applied initially. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994). Summary judgment is appropriate when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322–32 (1986)).

In deciding a motion for summary judgment, we review the facts in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of the non-movant. *Hullett*, 38 F.3d at 111. We do not, however, weigh the evidence or make credibility determinations, as those tasks are left for the finder of fact. *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008).

## III.    Analysis

DeFranco's three claims on appeal center on two actions (the removal of his single-cell status and his transfer to another prison facility), and raise constitutional

claims under the First and Eighth Amendments. DeFranco makes two claims of retaliation in violation of the First Amendment. First, he claims that his single-cell status was revoked because he threatened to sue prison officials. Second, he claims that he was transferred from SCI-Albion to SCI-Smithfield in retaliation for suing prison officials. DeFranco's Eighth Amendment claim centers on his desire to be housed in a single cell without a cellmate, and he claims that double-celling exacerbates existing health conditions. For the reasons that follow, we affirm the grant of summary judgment in all respects.

## A. DeFranco's First Amendment claims

### 1. First Amendment retaliation and inmates' rights

A prisoner alleging retaliation in violation of the Constitution must show three things: (1) constitutionally protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of constitutional rights and the adverse action. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).[2] Of these three elements, we focus on the causation prong here.

We have imported a burden-shifting framework into the prisoner-retaliation

---

[2] Although only the third element (causation) was in dispute in the District Court, here Showers additionally disputes whether the mere threat of a lawsuit against prison officials is a clearly established constitutional right. We need not decide that issue because we resolve the claim (retaliatory removal of single-cell status) in his favor on the causation prong.

14

context for proof of a "causal link between the exercise of [a prisoner's] constitutional rights and the adverse action taken against him." *Rauser*, 241 F.3d at 333. The first step is for the prisoner to prove that his protected conduct in exercising a constitutional right was a substantial or motivating factor in the challenged decision. *Id.* at 334. To establish the requisite causal connection for a retaliation claim predicated on the First Amendment, the plaintiff (here, a prisoner) usually must prove one of two things: (1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). If neither of these showings is made, then the plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation. *Id.*

Once the initial showing is made by the prisoner, the burden then shifts to the prison official to prove that the same decision would have been made absent the protected conduct for reasons reasonably related to a legitimate penological interest. *Rauser*, 241 F.3d at 334. This is a "deferential standard" meant to take into account "that the task of prison administration is difficult, and that courts should afford deference to decisions made by prison officials . . . who possess the necessary expertise." *Id.*

### 2.    Removal of single-cell status

We begin by assuming without deciding that threatening to file a lawsuit is constitutionally protected conduct, and that stripping single-cell status is sufficiently

15

adverse. Even assuming those elements, DeFranco's First Amendment claim based on retaliatory removal of single-cell status fails because he has not shown that there is a genuine issue of material fact regarding the causation prong of the retaliation test.

Nothing shows that DeFranco's threat to sue was a substantial or motivating factor in the challenged decision. *Rauser*, 241 F.3d at 333. Nor has he shown an unusually suggestive time proximity (or pattern of antagonism coupled with timing) between the threat to sue and the removal of the single-cell status sufficient to meet the "substantial or motivating factor" requirement. *DeFlaminis*, 480 F.3d at 267. Although DeFranco alleges that the Z-code review began within 10 days of the alleged threat that occurred in April 2002, the Z-code was not removed until mid-June 2002. This timing is not so close as to be unusually suggestive. Furthermore, looking at the record of the committee's votes in the light most favorable to DeFranco, there is nothing that refers to the threat of a lawsuit. The comments about him refer to his "manipulative" nature, that "psych" did not recommend a Z-code, and that every member of the committee voted "No" on the Z-code. DeFranco has also not alleged or made any showing that the psychological evaluation, while conducted by someone unfamiliar with him, was conducted by a person with knowledge of the threat to sue or that the resulting report recommending removal of the Z-code was motivated by the threat to sue.

Finally, even had DeFranco shifted the burden, there is no genuine issue of material fact that the same decision would have been made absent the threat to sue.

16

Indeed, the common theme throughout the vote sheet is captured by the comment of one of the committee members: "No need. Does not meet criteria [for a Z-code]." Effective allocation of the limited number of single-cell spaces is undeniably a legitimate penological interest, and establishing criteria for one of the spots is reasonably related to that interest. There is nothing in the record that permits a reasonable inference the decision would have been any different absent the threat to sue, as there is nothing in the record indicating that anyone other than Showers was aware of the threat or that it factored into the decision to remove the Z-code. Thus, DeFranco has not raised a genuine issue of material fact on causation between his alleged threat to sue and the removal of the Z-code. As such, summary judgment was properly entered against him on this claim.

### 3. Retaliatory transfer

#### a. The District Court had the right to revisit *sua sponte* its prior ruling

As a preliminary matter on the retaliatory transfer claim, we must determine whether the Second Order, which vacated the First Order insofar as it found a genuine issue of material fact on that claim, was properly entered and is therefore before us as a final judgment. On review of the record, we conclude that the District Court did not err in reconsidering *sua sponte* the motion for summary judgment on that claim.

While the First Order was favorable for DeFranco in that it denied summary judgment to Barr, it did not affirmatively grant summary judgment in favor of DeFranco

17

and thereby result in a final judgment that deprived the District Court of jurisdiction to reconsider the issue. Nor does the law of the case doctrine deprive that Court of its ability to reconsider the matter and come out differently in the Second Order.[3] *See Williams v. Runyon*, 130 F.3d 586, 573 (3d Cir. 1997). Although "the law of the case doctrine does not limit the power [of District Courts] to reconsider their prior decisions, [our] court has identified two prudential considerations that limit a court's authority to do so." *Id.* In order to revisit a prior decision, the Court must explain on the record the reasoning behind its decision to reconsider the prior ruling, and it must take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling. *Id.* In this case, the District Court adequately met the requirements of *Williams*.

In its First Order, the District Court identified what it believed to be a genuine issue of material fact regarding the retaliatory transfer claim:

> In light of this evidence it is certainly possible that a jury could find that Mr. Barr transferred Mr. DeFranco in retaliation for engaging in constitutionally protected activity. However, it is also possible that a jury could find that Mr. Barr's reasons for transferring Mr. DeFranco were not retaliatory. The burden will be on Mr. Barr to convince the jury that he transferred Mr. DeFranco for the reasons stated in his affidavit. Mr. Barr will also have to explain to [the jury] why he did not offer a full explanation for the transfer earlier. Questions

---

[3] The law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided." *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.). The doctrine "expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982) (citations omitted); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power.").

of the credibility of witnesses and determination of contested facts are for the fact-finder, not a court sitting in summary judgment. There exist genuine issues of material fact that make summary judgment on this claim inappropriate.

In contrast, the Second Order found summary judgment appropriate:

We have previously reviewed this issue when we denied both Plaintiff's and Defendants' motions seeking summary judgment on this claim. Because we are convinced that summary judgment is appropriate on this issue, we will vacate our prior Order dated June 12, 2007 (Doc. 279), insofar as we denied Defendants' Cross-Motion for Summary Judgment on Plaintiff's retaliatory transfer claim.

Following this statement, the District Court spent 24 pages elaborating its reasons why it was "convinced that summary judgment [was] appropriate," looking to applicable law, hearing transcripts, affidavits, documentary evidence, and its own prior rulings. This is certainly sufficient to satisfy the requirement that it explain on the record its reasoning behind the decision to reconsider the prior ruling.

Nor was there prejudice to DeFranco in the District Court's reconsideration. The only prejudice he alleges is that he could have submitted additional evidence or argument regarding the retaliatory transfer claim against Barr in a motion for reconsideration. This falls short. The type of prejudice we found sufficient in *Williams* was far more severe—there, Ms. Williams relied on a pre-trial ruling and proceeded to participate in impaneling a jury, put on her case, and obtained a jury verdict in her favor. 130 F.3d at 571. Only after a post-trial motion for a new trial (or in the alternative, judgment as a matter of law notwithstanding the verdict) did the Court reconsider its pre-trial ruling and

19

granted judgment against Ms. Williams. *Id.* This reconsideration was based on the same record as the pre-trial motion, as no evidence pertaining to the particular issue was presented by either party at trial. *Id.* at 573. We held that Ms. Williams was "clearly prejudiced" by relying on the pre-trial ruling that was only reversed "*after* trial *on the same record*." *Id.* (emphases in original). In DeFranco's case, by contrast, the District Court reconsidered its prior ruling before trial. DeFranco did not rely on the prior ruling, and he was not denied the opportunity to present evidence on his claim. Indeed, he was expected to provide all material in opposition to Barr's motion for summary judgment in the first instance, and to the extent that he claims he could have filed a motion for reconsideration, that option was still available to him.

Thus, the District Court did not err in reconsidering *sua sponte* its prior ruling on the First Amendment retaliation claim. Its reasons were adequately articulated in its Second Order, and DeFranco was not prejudiced by the reconsideration. Accordingly, the Second Order is properly presented for our review. Of course, we still exercise plenary review over that ruling.

### b. There is no genuine issue of material fact on the retaliatory transfer claim

Although we have no doubt that filing a lawsuit is constitutionally protected conduct, and transfer to another facility is sufficiently adverse, there is a dispute on appeal at the third (causation) prong of the retaliation test. DeFranco argues that he was

20

transferred from SCI-Albion to SCI-Smithfield in retaliation for filing a lawsuit against Barr, who disagrees and argues that there was no retaliatory motive, only a concern for the integrity of the grievance process.

The transfer petition references the litigation against Barr, and it also mentions Barr's concern that there could be "potential problems between [DeFranco] and future potential grievances." While it may facially appear that the litigation was the primary reason for the transfer, Barr can still prevail by showing that he would have "made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. It is undisputed that, even in the absence of the litigation against Barr, DeFranco was concerned with Barr's impartiality. *See, e.g.*, App. 205 ("Mr. Barr is the grievance counselor[,] so I [DeFranco] hope you [the Superintendent] will handle this matter."). Barr has consistently stated, and it remains undisputed, that DeFranco had become very concerned about Barr's role and decisions.

While the mere *ipse dixit* of a prison official alone is not always sufficient to show that the same decision would have been made absent the protected conduct, in the absence of any other evidence presented by DeFranco we conclude that there is no genuine issue of material fact. DeFranco had made numerous complaints about the integrity of the grievance process, and he was concerned that his grievances would not be fairly assessed if investigated by Barr. As already noted, we "recognize that the task of prison administration is difficult, and [we] should afford deference to decisions made by

21

prison officials . . . who possess the necessary expertise." *Rauser*, 241 F.3d at 334. In that light and on the facts in this case, we defer to the decision to transfer DeFranco from SCI-Albion to SCI-Smithfield (and thereby a different grievance officer) because it served the legitimate penological interest in a functioning grievance system free from any taint—perceived or real. *See Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995) (holding that the transfer of an inmate was not retaliatory because it had the salutary effect of "reducing the tension between the staff and [the inmate] without discouraging [the inmate] from seeking redress of his grievances"). Even without the addition of Barr to the lawsuit, DeFranco's frustration with Barr's role in the grievance process would have provided ample non-retaliatory justification for the transfer. Accordingly, we affirm the grant of summary judgment on this claim.

## C. DeFranco's Eighth Amendment Claim

### 1. Medical needs and the Eighth Amendment

DeFranco's Eighth Amendment claim stems from a purported medical need for single-celling. To demonstrate an Eighth Amendment violation, DeFranco must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). We have interpreted this to mean that there are two prongs to the inquiry: (1) deliberate indifference on the part of prison officials; and (2) the prisoner's medical needs are serious. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987); *accord Rouse v.*

22

*Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference is more than an "inadvertent failure to provide adequate medical care." *Estelle*, 429 U.S. at 105. It is more than mere negligence or medical malpractice without some more culpable state of mind. *Id.* at 106; *Rouse*, 182 F.3d at 197; *Lanzaro*, 834 F.2d at 346. For example, disagreement of professional opinion among doctors does not equal deliberate indifference. *Rouse*, 182 F.3d at 197; *Lanzaro*, 834 F.2d at 346. Instead, it requires "obduracy and wantonness . . .[,] which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse*, 182 F.3d at 197 (citations omitted).

**2.  Summary judgment was properly granted in favor of defendants on the Eighth Amendment claim**

Assuming without deciding that DeFranco's medical need was serious, DeFranco has not raised a genuine issue of material fact with respect to the "deliberate indifference" prong of the Eighth Amendment analysis. While there is a dispute as to what is the ideal treatment for DeFranco's condition, that alone does not create a genuine issue of material fact. At most, it demonstrates that there is a legitimate dispute among medical professionals.

On one side we have some medical professionals stating that single-celling would be ideal and that double-celling causes harm to DeFranco. On the other side we have some medical professionals stating that there is no harm, and that prescribing medication

23

is sufficient to address his heart condition. Because a mere disagreement of professional opinion among doctors does not mean deliberate indifference, this fails to create a genuine issue of material fact. *See Rouse*, 182 F.3d at 197; *Lanzaro*, 834 F.2d at 346. Furthermore, the record reflects that the committees that assign Z-codes considered the medical reports and a doctor's conclusion that DeFranco's heart condition would be adequately treated with medication when they voted to remove that status. Indeed, while Lindemuth eventually opined that single-celling would be ideal, she had previously prescribed medication to manage his symptoms. In the face of the reasonable debate among medical professionals, it cannot be said that the committee was deliberately indifferent to DeFranco's medical condition. Accordingly, DeFranco's Eighth Amendment claim fails.

\* \* \* \* \*

We affirm the judgment of the District Court.

24